UNITED STATES of America, Plaintiff,

v.

27.09 ACRES OF LAND, MORE OR LESS SITUATED IN the TOWN OF HARRISON AND the TOWN OF NORTH CASTLE, COUNTY OF WESTCHESTER, STATE OF NEW YORK; The County of Westchester; and Unknown Others, Defendants.

PURCHASE ENVIRONMENTAL PROTECTION ASSOCIATION, INC., and Allan Stone, Plaintiffs,

v.

The UNITED STATES POSTAL SERVICE, and Anthony Frank, as Acting Postmaster General of the United States, Defendants.

Nos. 88 Civ. 1805(MEL), 88 Civ. 2070(MEL).

United States District Court, S.D. New York.

May 15, 1990.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City, for plaintiff U.S.; Helen M. Toor, Diana Hassel, Asst. U.S. Attys., of counsel.

Marilyn J. Slaaten, Westchester County Atty., White Plains, N.Y., for defendant

County of Westchester; Susan B. Owens, Asst. County Atty., of counsel.

Sidley & Austin, New York City, for plaintiffs Purchase Environmental Protective Ass'n, Inc. and Allan Stone; Donald W. Stever, Mark Rachlin, Robert F. DiUbaldo, of counsel.

Arthur M. Schreier, Village Atty., Village of Harrison, N.Y., for proposed intervenors, Town of Harrison and Village of Harrison.

LASKER, District Judge.

These actions involve local opposition to the United States Postal Service's (the "Postal Service") condemnation of 23.24 acres of land (the "County parcel") belonging to Westchester County ("the County") and the Postal Service's potential condemnation of a portion of a 10.1 acre parcel owned by New York State (the "State parcel") for the construction of a large new General Mail and Vehicle Maintenance Facility ("the Facility") to replace existing facilities in Mount Vernon and White Plains, New York. The two parcels (collectively the "Airport site") are located in the Towns of Harrison and New Castle and are adjacent to the Westchester County Airport. The Postal Service has signed but has not filed a declaration of taking with respect to the State parcel.

Purchase Environmental Protective Association, a nonprofit group of more than 200 homeowners and merchants located near the Airport site, and Allan Stone, a member of the group and resident of Purchase (collectively "PEPA"), and the Town of Harrison and the Village of Harrison, New York (collectively "Harrison"), move to intervene in the condemnation action against the County parcel (the "County parcel action"). PEPA, as proposed defendant-intervenor, and the County also move for partial summary judgment,[1] or, in the alternative, for a preliminary injunction barring the condemnation of the County parcel until full compliance with the Na-

tional Environmental Protection Act ("NEPA"), 42 U.S.C. § 4332, and various Postal Service regulations has been achieved. The Postal Service cross-moves to strike the second, fourth, seventh, eighth and eleventh affirmative defenses raised by the County, or, in the alternative, for summary judgment.

In the action instituted by PEPA to bar condemnation of the state parcel (the "State parcel action"), PEPA moves for partial summary judgment on counts I, III and VI of the complaint or for a preliminary injunction barring any further steps towards condemnation, based on the same grounds as its motion in the County parcel action. The Postal Service moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) on ripeness and mootness grounds, or for summary judgment. Harrison moves to intervene.

## BACKGROUND

In 1982 the Postal Service began evaluating sites for a new facility to replace its existing General Mail Facility ("GMF") in Mount Vernon, New York. The Postal Service had concluded that the Mount Vernon facility would not be able to handle a projected rapid rise in the volume of the County's mail (which now accounts for 1.5 percent of all mail in the United States) and that it lacked easy access to major transportation routes. Over the next few years several sites were evaluated according to specific criteria developed in a Preferred Area Environmental Assessment prepared for the Postal Service.

By November 1987 the Postal Service had decided to look for a site that would also be large enough to accommodate a new Vehicle Maintenance Facility ("VMF") to replace its existing facility in White Plains. On January 6 and 8, 1988, the Postal Service published in the Reporter Dispatch, a Westchester newspaper, notice of its intention to prepare an Environmental Assessment ("EA") for the Airport site.

---

1. PEPA moves for summary judgment with respect to the first, second, fifth, and sixth affirmative defenses and the first, third and sixth counterclaims in PEPA's proposed Answer and

Counterclaims. The County moves for summary judgment on the first, second, fourth, seventh and eleventh affirmative defenses of its Answer, filed May 2, 1988.

On February 19, 1988 a completed EA was issued which stated that, as a result of field studies and a review of environmental data on the site, "significant environmental impacts are not anticipated which cannot be mitigated. Therefore, an Environmental Impact Statement is not warranted." [2] The required 90 day period for public comment on the EA was to have run through May 4, 1988.

On February 23, 1988, four days after the EA was prepared, Deputy Postmaster General Michael S. Coughlin signed declarations of taking for the two parcels. On March 16, 1988, prior to the expiration of the public comment period for the EA, the Postal Service condemned the County parcel. PEPA then instituted suit against the Postal Service, seeking a temporary restraining order and preliminary injunction prohibiting condemnation of the State parcel until the Postal Service completed the NEPA review process. PEPA and Harrison also filed motions to intervene in the County parcel action.[3] The litigation was stayed by consent of the parties while the Postal Service considered alternative sites for the facility. However, on December 23, 1988, the Postal Service prepared a new EA for the Airport site, and set a new comment period to run from January 1, 1989 to April 1, 1989.[4] The present motions were made between January and March 1989, and the original motions to intervene were renewed at that time.

In the fall of 1989 Congress passed a bill restricting funding for the facility until February 1, 1990 and requesting that the Postal Service report back to the Appropriations Committee as of that date regarding possible alternative sites. Pursuant to this legislation, Representative Nita Lowey appointed an independent Citizens Advisory Committee on Site Selection (the "Advisory Committee") which worked with a consultant retained by the Postal Service to identify and evaluate alternatives to the Airport Site. On January 8, 1990 the Advisory Committee recommended three alternate sites for consideration by the Postal Service. However, the Postal Service submitted detailed objections to all of the sites recommended by the Advisory Committee and recently issued a revised EA for the Airport site, for which the public comment period expired on April 25, 1990.

## I. THE NEPA CLAIM

■ The principal issue in the motions for partial summary judgment and the cross-motion to strike certain defenses is one of first impression in this circuit: whether the Postal Service must complete and fully comply with the NEPA environmental review process before condemnation. PEPA argues that the Postal Service's conceded failure to complete the NEPA review process prior to signing a declaration of taking on the State parcel and condemning the County parcel require that those legal actions be voided, or in the alternative, that no further actions be taken towards condemnation. According to PEPA, the Postal Service's attempted condemnation of the Airport site represents a commitment of resources (the estimated value of the State and County parcels is close to ten million dollars) towards construction of the facility which precludes unbiased consideration of less environmentally damaging alternative sites and predetermines the outcome of the NEPA review process prior to the incorporation and full review of public comments on the EA.

The relevant NEPA provision, 42 U.S.C. § 4332, states in pertinent part:

> The Congress authorizes and directs that, to the fullest extent possible: . . .

---

**2.** PEPA's Notice of Motion for partial summary judgment and for preliminary injunction (Jan. 10, 1989), Exhibit D, Environmental Assessment For GMF/VMF Facility Westchester, New York (the "Feb. 1988 EA"), dated Feb. 19, 1988 at viii.

**3.** New York State also moved for a preliminary injunction barring the Postal Service from taking title to the State parcel. This action was adjourned *sine die* by agreement of the parties.

*See* letter of Assistant United States Attorney Helen M. Toor to the court, dated December 16, 1988.

**4.** On January 12, 1989, this court granted the application of PEPA, the County and Harrison for an extension of sixty days from the date of this opinion in which to file their comments on the EA.

(2) all agencies of the Federal Government shall—

．　　．　　．　　．　　．

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which should be involved in the proposed action should it be implemented.

．　　．　　．　　．　　．

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.

Implementing regulations require that with regard to a "major federal action," that will significantly affect the environment, a federal agency must prepare an Environmental Assessment ("EA") to determine if a more comprehensive study, an Environmental Impact Statement ("EIS") should be prepared or if a finding of no significant impact on the environment ("FONSI"), is appropriate.[5]

The Postal Service concedes that it must comply with the requirements of NEPA because construction of the proposed facility constitutes a "major federal action," and that its actions to condemn the site were taken prior to completion of the public comment period for the EA, but asserts that compliance need not precede condemnation or the issuance of a declaration of taking.

PEPA argues that the Postal Service violated § 4332(C) by failing to complete preparation of an EA (including the incorporation of public comments), issue a formal FONSI and consider alternatives prior to condemning the County parcel and signing a declaration of taking with respect to the State parcel, thereby failing to allow meaningful public commentary as mandated by NEPA. PEPA argues that full compliance prior to condemnation is mandated by NEPA to ensure that the agency involved conducts a thorough and good-faith environmental review free of any preexisting commitment of resources, such as the funds committed to condemnation, which might cause the agency to forego consideration of less environmentally damaging alternative sites generated during the NEPA review process.

PEPA and the County rely on several cases which, they argue, held that NEPA compliance was required prior to condemnation or other legal actions such as the granting of licenses, loans or contract modifications. However, with two exceptions, the precise issue presented in this case—the timing of NEPA compliance vis-a-vis condemnation—was not addressed in the holdings of the cases cited. In *Stockslager v. Carroll Electric Coop. Corp.*, 528 F.2d 949 (8th Cir.1976), for instance, the court held that the anti-injunction statute, 28

5. *See* 40 C.F.R. § 1508.9, which states in relevant part:

"Environmental assessment":
(a) *Means a concise public document for* which a Federal agency is responsible that serves to:
(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.
(2) Aid an agency's compliance with [NEPA] when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.
(b) Shall include brief discussions of the need *for the proposal, of alternatives as required* by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.
*See also* 40 C.F.R. §§ 1508.11, 1508.13, defining "Environmental impact statement" and "Finding of no significant impact" respectively.

U.S.C. § 2283, was not a bar to a district court injunction of state condemnation proceedings because the injunction was based on failure to comply with NEPA. The court stated:

> If an environmental impact statement is required, which we do not now decide, the entire process would be frustrated, if Carroll Electric is allowed to proceed with condemnation of lands and construction of the power line, because of loans that REA has already authorized.

*Id.* at 952. However, in *Carroll Electric*, the district court had enjoined all *construction*, except on lands condemned by the state. The court of appeals' decision to extend the scope of the injunction to cover state lands did not specifically address the issue of whether NEPA compliance was required before instituting condemnation proceedings.

Other cases cited by PEPA are similarly inapposite or distinguishable. *See Gibson v. Ruckelshaus,* 3 E.R.C. 1028, 1030 (E.D. Tex.1971) (enjoining city's condemnation proceedings for federally funded project for failure to comply with any NEPA requirements); *U.S. v. 247.37 Acres of Land,* 3 E.R.C. 1098, 1105 (S.D.Ohio 1971) (holding NEPA retroactively applicable to proposed project initiated prior to the effective date of NEPA);[6] *Monarch Chemical Works, Inc. v. Thone,* 604 F.2d 1083, 1090–91 (8th Cir.1979) (holding proposed work release center had not "reached sufficient maturity" to require inclusion in city's EA, because no site had been selected and no "concrete architectural plans or other detailed planning" had occurred). *Environmental Defense Fund v. Froehlke,* 473 F.2d 346, 350 (8th Cir.1972) (requiring full information be provided in EIS); *Appala-chian Mountain Club v. Brinegar,* 394 F.Supp. 105, 118–119 (D.N.H.1975) (holding NEPA compliance must precede construction of segment of proposed highway).

PEPA and the County assert that NEPA was intended to require governmental decision makers to consider all of the adverse environmental consequences of a decision to site a project *before* favoring a specific site by making a commitment of resources, such as condemnation. They cite *Sierra Club v. Marsh,* 872 F.2d 497 (1st Cir.1989), in which the court reaffirmed its earlier holding in *Commonwealth of Massachusetts v. Watt,* 716 F.2d 946 (1st Cir.1983), that when considering a request for a preliminary injunction based on a NEPA violation, the district court should take into account the environmental harm resulting from "the added *risk* to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment." 872 F.2d at 500. In *Watt* the court analyzed the difference between environmental statutes designed to protect the integrity of the nation's natural resources and NEPA's focus on the environmental review process:

> [W]hen a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered.... Moreover, to set aside the agency's action at a later date will not necessarily undo the harm. The agency ... may well have become committed to the previously chosen course of action, and new information—a new EIS—may bring about a *new* decision, but it is that much

---

**6.** In *247.37 Acres* the court did state in dictum:

> [T]he Government claims that this is merely a land acquisition case and the defendant may not pose any defense based on what the land is going to be used for until construction actually starts. No authority whatever is cited for that proposition. The taking act requires in the declaration of taking a statement of "the public use for which said lands are taken." In other words, under the taking statute itself, one cannot separate, as the Government would, the taking from the use. Fur-thermore, if the Government's construction were adopted, a land owner could not attempt to bridle a horse until it was out of the barn door.

3 E.R.C. at 1104. However, the court held only that complete non-compliance with NEPA was a valid defense to a condemnation, it did not require that NEPA compliance precede condemnation. In *247.34 Acres* the United States, contrary to the Postal Service's position in the case at hand, asserted that NEPA was totally inapplicable.

less likely to bring about a *different* one. It is far easier to influence an initial choice than to change a mind already made up....

It is appropriate for the courts to recognize this type of injury in a NEPA case, for it reflects the very theory upon which NEPA is based—a theory aimed at presenting governmental decision-makers with relevant environmental data *before* they commit themselves to a course of action.

716 F.2d at 952 (emphasis in original) (citations omitted). While this quotation provides a useful statement of the general purpose of NEPA, what constitutes an agency's commitment to a course of action must be determined according to the facts of each particular case. Neither *Watt* nor *Marsh* state a per se rule defining commitment to a course of action or requiring that full NEPA compliance precede condemnation or other pre-construction legal acts.

In a per curiam decision in *Thompson v. Fugate*, 452 F.2d 57, 58 (4th Cir.1971) the court affirmed the granting of a preliminary injunction barring condemnation of a historic site for construction of a highway. The district court originally enjoined all construction but not condemnation. The court of appeals then granted an injunction enjoining condemnation pending trial and decision on the merits. This two paragraph per curiam decision lacks analysis and is not persuasive.

PEPA and the County rely most heavily on *United States v. 18.2 Acres of Land More or Less*, 442 F.Supp. 800, 807 (E.D. Cal.1977), in which the court held that non-compliance with NEPA was a valid defense to a condemnation action and that a genuine issue of material fact existed as to whether NEPA requirements had been satisfied. The *18.2 acres* court reasoned that a condemnation was, by definition, a decision to put land to a public use, requiring NEPA compliance:

The United States contends that the mere taking of title cannot be said to have any effect on the environment. However, in order for a taking to be valid, it must be for a public use. Thus a condemnation action, by its very nature, is a decision to put land to a certain public use, which may have a significant effect on the environment. The taking and the use cannot be viewed separately: either the taking is for a public use, which requires NEPA evaluation, or it is not for a public use, in which case it is an improper exercise of eminent domain.

. . . . .

It is sufficient at this point to hold simply that the decision to condemn land for a public use, just like any other federal agency decision, is subject to the application of NEPA.

442 F.Supp. at 807.

The Postal Service persuasively distinguishes *18.2 Acres* as a case in which the taking was inseparable from the use to which the land would be put; the government sought an easement over a private road which would have necessarily established public access to which the property owner objected. In the instant case, the Postal Service asserts, the use of the land is separable from the legal acts of condemnation and signing a declaration of taking because the Postal Service may sell the land or put it to a different use if, after the NEPA review process is complete, the proposed facility is not constructed on the Airport site.

The distinction between the legal act of condemnation and the ultimate use to which the land will be put, was thoroughly analyzed in *Stand Together Against Neighborhood Decay, Inc. v. Board of Estimate*, 690 F.Supp. 1192 (E.D.N.Y.1988), in which the court denied plaintiffs' motion to enjoin condemnation of land for the Metro-Tech urban renewal project in Brooklyn because there was no showing of irreparable harm stemming from the municipal defendants' failure to comply with NEPA prior to condemnation. The *Stand Together* court distinguished *18.2 Acres:*

Condemnation may represent irrevocable commitment to a public use, but condemnation does not define the public use nor the environmental review that may continue after title to the property is acquired. In the case at bar, for instance,

if office construction on the land to be condemned is later enjoined as violative of federal law, the City might be able to use all or part of the site as a park. *Id.* at 1197 n. 6. The opinion then stated:

This Court agrees with *Oak Creek's* [*City of Oak Creek v. Milwaukee Metro. Sewerage Dist.*, 576 F.Supp. 482, 490 (E.D.Wisc.1983)] evaluation of the relative harmlessness of land acquisition vis-a-vis ultimate project construction. The case may arise in which exercise of the eminent domain power is so closely linked to the ultimate public use that land acquisition sets in motion an irresistible force of environmental degradation. In the instant case, however, the Court's equitable powers, the time lag between land acquisition and significant environmental change, and the notice commitment made by the municipal defendants all ensure that the environment can be protected if such protection becomes necessary.

*Id.* at 1198. (footnote omitted).

The analysis in *Stand Together* is persuasive. In the instant case, neither the condemnation proceedings instituted against the County nor the declaration of taking on the State parcel represent an irretrievable commitment of resources by the Postal Service. If, once the full NEPA process has run its course, the Postal Service decides not to build or is barred from building the facility on the Airport site, the Postal Service could resell the condemned land or use it for a different type of (and perhaps less environmentally damaging) postal facility. This is not, as PEPA and the County argue, a case in which "exercise of the eminent domain power is so closely linked to the ultimate public use that land acquisition sets in motion an irresistible force of environmental degradation." 690 F.Supp. at 1198. In sum, in this case acquisition of the Airport site does not "define" use.

Other decisions support the Postal Service's position. In *United States, TVA v. Three Tracts of Land*, 377 F.Supp. 631 (N.D.Ala.1974), the court granted summary judgment to the Tennessee Valley Authority ("TVA"), which had filed a declaration of taking to condemn land for an inventory of sites for construction of electric plants. Respondent landowners objected on the ground that the TVA had not complied with NEPA. In striking this defense the court stated:

[T]he mere acquisition of the title to the land without more would not require compliance with NEPA. While it is true that the contemplated use was for a nuclear generating plant, that decision was not necessarily coupled to the taking since it was not certain it would be used for a nuclear plant or for any steam plant.... [E]ven if it was so coupled, it would not require a different result. The character of the use is not changed by the mere taking.... It is the Court's opinion that TVA was authorized to take the land as an inventory of sites for possible use in carrying out its functions without the necessity of complying with NEPA at that stage.

*Id.* at 637–38. *See City of Oak Creek v. Metropolitan Sewerage Dist.*, 576 F.Supp. 482, 490 (E.D.Wisc.1983) (holding full NEPA compliance not required prior to condemnation and stating: "It is the landfill itself, not the land acquisition, that causes the major environmental impact."); *United States v. 162.50 Acres of Land*, 567 F.Supp. 987, 990 (N.D.Miss.1983) (taking of title does not represent an irretrievable commitment of resources), *aff'd*, 733 F.2d 377 (1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 920 (1985); *United States v. 45,149.58 Acres of Land, etc.*, 455 F.Supp. 192, 203 (E.D.N.C.1978) (failure to comply with NEPA not a valid defense in a condemnation action).

Should the Postal Service later fail to achieve full NEPA compliance, PEPA and the County may seek to enjoin construction. By permitting the condemnation of the Airport site to proceed prior to full compliance this opinion does not render any judgment on the merits of the NEPA review which the Postal Service has initiated, and which must be completed prior to construction.

Accordingly, the Postal Service's motion to strike defenses is granted with respect to the County's second affirmative defense. The motions for partial summary judgment by PEPA and the County are denied with respect to the County's second affirmative defense, PEPA's proposed second affirmative defense, and that portion of PEPA's proposed first counterclaim which alleges a violation for failure to comply with NEPA prior to condemnation.

## II. POSTAL SERVICE SITE ACQUISITION REGULATIONS

PEPA and the County argue that the Postal Service violated its own property acquisition regulations in condemning the County parcel and signing a declaration of taking on the State parcel.

### ■ A. *"Unusual and Compelling Circumstances"*

39 C.F.R. § 777.31(a) states in relevant part:

> The Postal Service, as a matter of policy, acquires interests in real property through voluntary agreements with owners. Only under unusual and compelling circumstances, and on a case-by-case basis, does the Postal Service acquire real property through the exercise or the threat of the exercise of eminent domain.

PEPA and the County assert that the Postal Service has failed to make a finding of or demonstrate any "unusual and compelling circumstances" justifying acquisition of the County parcel or the attempted acquisition of the State parcel by eminent domain. The Postal Service argues that the cited regulation is not legally enforceable because 39 C.F.R. § 777.12 states: "The purpose of these regulations is to update policy and procedures for the Postal Service's voluntary compliance with the [Uniform Relocation Assistance and Real Property Acquisition Act of 1970.]" The Postal Service also argues that even if section 777.31 is considered legally binding, the Postal Service has complied: Deputy Postmaster General Michael S. Coughlin determined that "unusual and compelling circumstances" existed prior to issuing declarations of

taking for the County parcel and the State parcel in February 1988. At the request of the court following oral argument in this case, Coughlin submitted an affidavit, which describes the circumstances surrounding his finding.

The Postal Service contends that the regulation at issue was promulgated only to describe the policies it adopted to voluntarily comply with the Uniform Relocation Assistance and Real Property Acquisition Act of 1970 ("the Real Property Act"), and that it is not legally bound to comply with the Act. 39 U.S.C. § 410(a) states that, with certain exceptions that do not include the Real Property Act: "no Federal law dealing with public or Federal contracts, *property*, works, officers, employees, budgets, or funds ... shall apply to the exercise of the powers of the Postal Service." (emphasis added). Accordingly, because the Real Property Act addresses property acquisition issues, it does not apply to the Postal Service.

Because the regulation is not promulgated pursuant to a statute which applies to the Postal Service, but rather one with which the Postal Service voluntarily complies, and the text of the regulation explicitly states a policy objective, not a binding obligation, the regulation is not legally enforceable. To hold otherwise would discourage the Postal Service from issuing any regulations describing policies with which it only voluntarily complies. *See United States v. Ng*, 699 F.2d 63, 71 (2d Cir.1983) ("To hold the [internal prosecutorial] policy legally enforceable would be to invite the Attorney General to scrap it, which would hardly be in the public interest."). Neither PEPA nor the County have cited any cases in support of their position that this regulation is enforceable against the Postal Service. Accordingly, the Postal Service's motion to strike defenses is granted with respect to the County's eleventh affirmative defense. The motions of PEPA and the County for partial summary judgment are denied with respect to the County's eleventh affirmative defense, PEPA's proposed sixth counterclaim, that portion of PEPA's proposed first counterclaim

which is based on paragraph 66, and PEPA's proposed fifth affirmative defense, and those claims and defenses are dismissed.

### B. *Handbook RE–6*

■ PEPA asserts that the Postal Service violated its Handbook RE–6 § 224.1 which states in relevant part that, during the environmental assessment of a proposed project, responsible Postal personnel:

must identify and describe operational alternatives that will best satisfy the project needs described in the concept. A *no action* (the present baseline situation) alternative will also be identified.[7]

PEPA also argues that the Postal Service failed to prepare a site planning report, "to identify and describe in detail viable site alternatives" for a given project, as required by section 231 of Handbook RE–6.[8]

The Postal Service contends that Handbook RE–6 is an internal agency document which is not a legally enforceable set of regulations, and that, in any event, a site planning report is not required to be published, and, moreover, all of the information required to be included in the site planning report was accumulated.

PEPA and the County argue that Handbook RE–6 is an enforceable regulation with which the Postal Service must comply, even though it is not published in the Code of Federal Regulations. *See Reuters Ltd. v. FCC,* 781 F.2d 946, 950 (D.C.Cir.1986) ("it is elementary that an agency must adhere to its own rules and regulations"). PEPA and the County assert that Handbook RE–6 is generally incorporated by the Postal Service as a regulation pursuant to 39 C.F.R. § 211.2, which states in relevant part:

(a) The regulations of the Postal Service consist of:

. . . . .

(3) Headquarters Circulars, Management Instructions, Regional Instructions, *handbooks,* delegations of authority, and other regulatory issuances and directives of the Postal Service ... Any of the foregoing may be published in the FEDERAL REGISTER and the Code of Federal Regulations.

(emphasis added). The Postal Service replies that section 211.2(a)(3) is merely a general description of the generic sources from which Postal Service regulations are drawn and that a particular handbook only becomes a regulation when it is specifically incorporated as such. For instance, the Postal Service has specifically incorporated its Domestic Mail Manual in its regulations. *See* 39 C.F.R. § 111.1.

In *United States v. City of Pittsburg, Cal.,* 661 F.2d 783, 785 n. 1 (9th Cir.1981), the only case cited by any party which interprets section 211.2(a)(3), the court determined, in a footnote and without analysis, that a Post Office Department regional manual was incorporated by reference as a valid regulation pursuant to 39 C.F.R. § 211.2(a)(3). In *Pittsburg* the court held in favor of the United States that the Post Office manual preempted a conflicting local ordinance. *Pittsburg* did not hold that an agency handbook is legally enforceable against the Postal Service or that incorporation of a handbook as a regulation pursuant to § 211.2(a)(3) makes that regulation legally enforceable.

Moreover, several cases have held that internal agency documents, such as handbooks, are not enforceable against an agen-

---

**7.** Proposed Defendant–Intervenor Purchase Environmental Protective Association's Notice of Motion (Jan. 10, 1989), Exhibit C, Environmental and Intergovernmental Review Procedures, dated May 29, 1987 (hereinafter "Handbook RE–6") at § 224.1 (*emphasis in the original*).

**8.** Handbook RE–6 § 231 states in full:

Upon receiving the document describing the operational alternative(s) (see 224.3) and their respective site requirements, and using the preferred area environmental assessment (if one has been prepared) as a guide, the responsible postal official must:

a. Survey the locale of the proposed action to identify and describe in detail viable site alternatives that will satisfy the operational alternative(s):

b. Indicate the matching relationship between the site alternates and the operational alternative(s); and

c. Assemble this information in a site planning report.

cy. *See Lynch v. United States Parole Commission*, 768 F.2d 491, 497 (2d Cir. 1985) (parole commission manual does not create due process rights enforceable by prisoners); *United States v. New York Tel. Co.*, 644 F.2d 953, 959 n. 10 (2d Cir.1981) (IRS manual does not have the effect of law). In the case at hand, the Handbook does not purport to create individual rights or obligations, and thus must be distinguished from agency documents that do directly affect citizens. For instance, in *United States v. Fifty–Three (53) Eclectus Parrots*, 685 F.2d 1131, 1136 (9th Cir.1982) the court held that a provision of the U.S. Customs Manual was not a rule affecting an individual's statutory rights but was merely an unenforceable internal procedure. The *Eclectus Parrots* court stated:

> To have the " 'force and effect of law,' " enforceable against an agency in federal court, the agency pronouncement must "(1) prescribe substantive rules—*not* interpretive rules, general statements of policy or rules of agency organization, procedure or practice—and, (2) conform to certain procedural requirements." [*Rank v. Nimmo*, 677 F.2d 692, 698 (9th Cir.1982) (quoting *Chasse v. Chasen*, 595 F.2d 59, 62 (1st Cir.1979) ] (emphasis in original). To satisfy the first requirement the rule must be legislative in nature, affecting individual rights and obligations; to satisfy the second, it must have been promulgated pursuant to a specific statutory grant of authority and in conformance with the procedural requirements imposed by Congress. *Id.*

685 F.2d at 1136. Like the provision of the U.S. Customs Manual held unenforceable in *Eclectus Parrots*, the pertinent provisions of Handbook RE–6 prescribe rules of agency procedure and practice which do not "affect individual rights and obligations" and which are not legislative in nature.

Handbook RE–6 is merely a detailed set of procedures for Postal Service implementation of NEPA regulations issued by the Council on Environmental Quality ("CEQ").[9] In sum, the provisions of Handbook RE–6 are not enforceable.[10]

Accordingly, the Postal Service's motion to dismiss is granted with respect to the County's seventh and eighth affirmative defenses. The motions by PEPA and the County for partial summary judgment are denied with respect to the County's seventh affirmative defense, PEPA's proposed sixth affirmative defense and those portions of PEPA's proposed first and third counterclaims which rely on Handbook RE–6.

## III. POSTAL SERVICE WETLANDS REGULATIONS

■ PEPA and the County argue that the Postal Service has failed to comply with various provisions of 39 C.F.R. Part 776,[11] and related provisions of Handbook RE–6. 39 C.F.R. § 776.5 states:

(a) *Restriction of Consideration of Floodplain/Wetland.* During the evaluation of contending sites for a proposed project, floodplain and wetlands areas may be considered *only* when there is no practicable alternative site.

(b) *Floodplain/Wetland Information.* Floodplain and wetland information must be compiled and considered throughout the facility planning process. If a proposed action will occur in or impact a floodplain or wetland site, specific floodplain or wetland information must be developed.

(emphasis in original). The information required to be developed pursuant to § 776.5(b) must document the effects of the proposed action on the floodplain or wetland, 39 C.F.R. §§ 776.5(b)(1)–(5), and

---

**9.** Handbook RE–6 at § 111.

**10.** However, the claims raised by PEPA and the County concerning the Postal Service's alleged failure to comply with various provisions of the Handbook may be relevant to future judicial review of the Postal Service's overall compliance with NEPA, once the NEPA review process has been completed.

**11.** 39 C.F.R. part 776, "FLOODPLAIN MANAGEMENT AND PROTECTION OF WETLANDS PROCEDURES" were promulgated to implement executive orders issued pursuant to NEPA. *See* 39 C.F.R. § 776.1. The Postal Service has not argued that these regulations are unenforceable.

such information "must be evaluated in an Environmental Impact Statement or an Environmental Assessment, if either is prepared, and made available to the public." 39 C.F.R. § 776.5(c). Similarly, a "Site Planning Report," which is defined in the regulations as a "document used to identify and evaluate sites available for a proposed construction or real estate action," [12] must include a determination "whether any of the identified site alternatives would require construction in, or appear to have an impact on, a floodplain or wetland." 39 C.F.R. § 776.5(d). The regulations further state:

> If, after consideration of the Site Planning Report, Environmental Assessment, and preliminary Economic Analysis Report, the determination is that there appears to be no practicable alternative to locating in a floodplain or wetland, a final reevaluation of alternatives must be conducted.

39 C.F.R. § 776.5(f). Finally, and most significantly, 39 C.F.R. § 776.8(a)–(c) requires that "[p]ublic notice of Postal Service plans for locating a proposed project in a floodplain or wetland" be provided, which "must contain a provision for a 30–day public commenting period before any action is taken to acquire the site."

PEPA and the County contend that the Postal Service has completely failed to comply with the regulations cited above. For example, they assert that no determination that "no practicable alternative exists to locating in a floodplain or wetland" was made and none of the required wetland information was developed prior to condemnation. Moreover, PEPA and the County point out that no public commenting period was provided for prior to condemnation of the County parcel.

The Postal Service originally asserted that no wetlands existed on the County parcel and that less than one acre of wetlands existed on the State parcel, and therefore it had complied with its wetlands regulations because the facility would not be sited on a wetland and therefore no wetlands information was required to be developed. However, in June 1989 the Postal Service's contractor discovered, and subsequent Postal Service studies confirmed, previously unidentified wetlands areas on the County parcel, and additional wetland acreage on the State parcel. Accordingly, the Postal Service now concedes that there are 1.388 acres of wetlands on the 23.24 acre County parcel, and that construction of the proposed facility may be in a wetland area. The Postal Service indicated in November 1989 that it would prepare a Wetland Impact Report, examining measures which would mitigate the adverse environmental impact of siting in a wetlands area, and has stated that it must make a finding of no practicable alternative if it decides to site the project on the County parcel.[13]

The Postal Service clearly did not provide the required public notice before acquiring the County parcel by condemnation, as specifically required by its own regulations, 39 C.F.R. § 776.8. The Postal Service's argument that § 776.8 does not apply to a situation in which wetlands are discovered only after condemnation is unpersuasive. Moreover, no explanation has been offered as to why these wetlands were not detected during the preparation of the first two environmental assessments of the Airport site and why they were only inadvertently detected during soil tests conducted by the contractor.

However, given the Postal Service's stated intention to prepare a Wetland Impact Report and to make a finding of no practicable alternative if necessary, the question remains whether the condemnation should be set aside or whether resolution of these issues should be reserved, pending completion of the wetlands review process, to determine whether the Postal Service's failure to comply with its regulations prior to condemnation has made any practical difference. Under these circumstances the

---

12. 39 C.F.R. § 776.4(c).

13. *See* Supplemental Affidavit of Charles Vidich (Nov. 13, 1989) and letter from Diana Hassel, Assistant United States Attorney, to the court, dated Nov. 13, 1989.

more constructive thing to do is to defer decision of the claims relating to the Postal Service's alleged non-compliance with the provisions of 39 C.F.R. part 776 until the Postal Service has determined whether it plans to site the facility in the wetlands areas, and if so, whether there is no practicable alternative site. However, to the extent that the claims by the County and PEPA rely on wetlands provisions contained in Handbook RE–6, they are dismissed.

## IV. THE MOTIONS TO INTERVENE

Harrison's motion to intervene in the State parcel action is not opposed by any party and, accordingly, is granted.

 PEPA and Harrison also move to intervene as defendants in the County parcel action. Regardless whether PEPA and Harrison are entitled to intervene as of right, they already meet the requirements of permissive intervention pursuant to Fed. R.Civ.P. 24(b). Their claims and defenses clearly share common questions of law and fact with, and their intervention will not delay or prejudice the rights of, the Postal Service or the County.[14] Moreover, both PEPA and Harrison have primary interests in this action which differ from the County and which could not be adequately represented by the County or each other. Harrison is primarily interested in preserving the integrity of its zoning and planning scheme and town water supply and enforcing its local wetlands ordinance.[15] PEPA's primary objective is to address the very specific environmental concerns of its members, some of whom live outside of Harrison. In contrast, the County is primarily interested in preserving the property for potential future use by the neighboring Westchester County Airport and in maximizing the amount of the compensation it will receive. Accordingly, the motions to intervene are granted.

## V. THE STATE PARCEL ACTION

 The Postal Service contends that PEPA's claims with respect to the declaration of taking with respect to the state parcel are not ripe or are moot and should be dismissed. Because the Postal Service never filed but only signed the original Declaration of Taking, and has indicated that it will file a new declaration of taking on a smaller portion of the state parcel,[16] and has agreed to notify PEPA at least ten days prior to initiating condemnation proceedings on that smaller portion, it argues that there has been no final agency action and therefore no case or controversy exists. The Postal Service also argues that because it has stated that it will not use the Declaration of Taking signed on February 23, 1988, which is the subject of the State parcel action, this law suit is moot.

In *Occidental Chemical Corp. v. FERC*, 869 F.2d 127 (2d Cir.1989) the court specified four criteria for determining ripeness:

(1) whether the issues presented are purely legal; (2) whether the challenged agency action constitutes 'final agency action' within the meaning of the Administrative Procedure Act; (3) whether the challenged agency action has or will have a direct and immediate impact on the petitioner; and (4) whether the resolution of the issues will foster, rather than impede, effective enforcement and administration by the agency.

*Id.* at 129 (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967) and *Pennzoil Co. v. Federal Energy Regulatory Commission*, 742 F.2d 242, 244 (5th Cir.1984)). *Occidental Chemical* held petitioner's claims not ripe because the challenged order had been stayed pending completion of a rulemaking proceeding and:

[T]he rulemaking process, with its public comments, may lead to new factual information that will inform the Commission's

**14.** Harrison has not filed for summary judgment.

**15.** Harrison Notice of Motion to Intervene (June 3, 1988), Affidavit of Arthur M. Schreier, dated June 1, 1988, at ¶¶ 7–12.

**16.** The Declaration of Taking on the State land signed on February 23 was for 9.96 acres of the 10.1 total acreage. The new Declaration of Taking would apply to only 4.06 acres.

final decision. Second, there has been no final agency action.... Third, the challenged agency action will not have a direct impact on the petitioner because the order is stayed until the completion of the Commission's rulemaking proceeding. Fourth, a judicial decision at this time would merely impede the agency's efforts to complete its rulemaking proceeding and to formulate rules for implementation of its decision.

869 F.2d at 129. Similarly in this case the completion of the NEPA review process and the Postal Service's new Wetlands Impact Report may lead to new information that will cause the Postal Service not to institute condemnation against the State parcel. Second, there is no final agency action; there is only a signed, but not filed, Declaration of Taking which the Postal Service has said it will not use. Third, the Declaration of Taking will not have a direct or immediate impact upon PEPA or Harrison because it will not be filed. Fourth, there can be no decision on the claim that the Postal Service violated its site acquisition procedures because there has been no acquisition of the State parcel nor has condemnation even been initiated. With respect to the claim that wetlands regulations were violated, the Postal Service has indicated that it is studying the site and will issue revised reports in compliance with its regulations. Accordingly, since no ripe claims exist for resolution in the State parcel action, with the exception of the NEPA claims dismissed in Part I above, the Postal Service's motion to dismiss the State parcel action is granted.

## VI. PRELIMINARY INJUNCTION

■ PEPA and the County argue that even if their motions for partial summary judgment are denied, they are entitled to a preliminary injunction barring the Postal Service from taking any further steps towards condemnation of the County parcel or the State parcel. Given the dismissal of the State parcel action, the only remaining question is whether PEPA and the County are entitled to a preliminary injunction in the County parcel action. A party seeking a preliminary injunction in this circuit must

show 1) irreparable harm and 2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 972 (2d Cir.1989).

PEPA and the County's argument that an injunction is necessary to ensure the fullest possible compliance with NEPA is unwarranted, given the lack of any showing of irreparable harm, likelihood of success on the merits or a balance of hardships tipping in their favor. Moreover, the Postal Service is not required to demonstrate full compliance with NEPA prior to condemnation in this case and the Postal Service has indicated that it plans to fully comply. Injunctive relief is not necessary, as PEPA and the County argue, to make NEPA effective in this case. As explained in Section II of this opinion, there has been no irreversible commitment of resources by the Postal Service. Accordingly, the motions for a preliminary injunction are denied.

\* \* \* \* \* \*

In sum, with respect to the County parcel action, the Postal Service's motion to strike defenses is granted and the County's motion for partial summary judgment is denied with respect to the County's first, second, seventh, eighth and eleventh affirmative defenses. With respect to the County's fourth affirmative defense, the Postal Service's motion is granted and the County's motion is denied as to those claims arising under Handbook RE–6 but decision is deferred on the remaining claims. The motions to intervene by Harrison and PEPA are granted. PEPA's motion for partial summary judgment is denied in all respects except that decision is deferred with respect to those portions of the first and third counterclaims which are based on wetlands regulations contained in the Code of Federal Regulations. The motions by PEPA and the County for a preliminary injunction are denied.

In the State parcel action Harrison's motion to intervene is granted. The Postal

Service's cross-motion to dismiss is granted. PEPA's concurrent motions for summary judgment or for preliminary injunction are denied.

It is so ordered.