**CONSERVATION LAW FOUNDATION, INC. and Town of Newington**

v.

**DEPARTMENT OF the AIR FORCE, et al.**

**No. CV–92–156–L.**

United States District Court, D. New Hampshire.

Aug. 29, 1994.

Robert A. Backus, Backus, Meyer, Solomon & Rood, Manchester, NH, Lewis M. Milford, Conservation Law Foundation, Montpelier, VT, for Conservation Law Foundation, Inc.

Malcolm R. McNeill, Jr., McNeill & Taylor, P.A., Dover, NH, Eliot R. Cutler, Cutler & Stanfield, Washington, DC, for Town of Newington, New Hampshire.

T. David Plourde, Asst. U.S. Atty., Concord, NH; Craig D. Galli, Beverly Sherman

Nash, Dept. of Justice, Environment & Natural Resources Div., General Litigation Section, Washington, DC, for Dept. of Air Force, Secretary, U.S. Air Force, U.S. E.P.A., Administrator, U.S. E.P.A.

Steven M. Houran, Concord, NH, Donald W. Stever, Jr., Dewey Ballantine, New York City, for Pease Development Authority, and State of N.H.

Stephen S. Ostrach, New England Legal Foundation, Boston, MA, Thomas R. Watson, Watson, Lyons & Bosen, PA, Portsmouth, NH, for The Seacoast Coalition for Jobs, Portsmouth Chamber of Commerce, the Granite Foundation and Business and Industry Assn. of New Hampshire.

## ORDER

LOUGHLIN, Senior District Judge.

Before the court are plaintiffs' Conservation Law Foundation and Town of Newington's Motions for Summary Judgment (doc. #54 & 55) and Federal Defendants' Cross Motion for Summary Judgment (doc. #138). Defendant Pease Development Authority has also filed a Motion to Dismiss all Clean Air Act claims (doc. #134) and in the alternative a Motion for Summary Judgment on the Clean Air Act claims (doc. #135). For the reasons stated below, the motions are granted in part and denied in part.

### Background

This case arises from the decision of the Commission on Base Realignment and Closure to close Pease Air Force Base located within the boundaries of both the Town of Newington and Portsmouth, New Hampshire. The base consists of approximately 4,255 acres and during full operation consisted of a runway, fuel storage area, administrative and commercial center, dormitory facilities, family housing, a hospital, two schools and a golf course. On March 31, 1991, the base was closed and the Air Force ("USAF") began preparation of an environmental impact statement which evaluated several proposals for the development and reuse of the base.

The Air Force prepared Draft and Final Environmental Impact Statements to analyze the environmental impact of the transfer and redevelopment of the base. In May 1990, the USAF issued an Environmental Impact Statement ("EIS") addressing the environmental impact of the base closure. See FEIS (USAF Ex. 299). A separate EIS was later prepared to address the environmental impact of disposal and reuse of the base.

A Draft Environmental Impact Statement on the Disposal and Reuse of Pease Air Force Base ("DEIS") was published in February 1991. On March 30, 1991, Conservation Law Foundation ("CLF") filed comments on the DEIS. See CLF DEIS Comments (USAF Ex. 128). Those comments addressed CLF's air quality concerns and the Air Force's obligations under the Clean Air Act ("CAA" or "the Act"). On April 1, 1991, the Environmental Protection Agency ("EPA") submitted comments on the DEIS. See EPA DEIS Comments (USAF Ex. 212). Those comments addressed the EPA's air quality concerns. The EPA recommended a more complete air analysis to determine the true extent that the development would have on the ozone problems in southern New Hampshire.

The EPA urged that the analysis and a subsequent review by the EPA be complete prior to the publication of the Final Environmental Impact Statement ("FEIS"). The EPA also addressed concerns relative to the cleanup of hazardous waste located on the base. The EPA rated the project EO-2. The category EO states that there are significant environmental impacts which must be avoided in order to ensure adequate environmental protection, while a rating of 2 denotes that the DEIS contained insufficient information to fully assess the environmental impact.

On June 14, 1991 the FEIS was issued. The FEIS evaluated the air quality impact and concluded that the redevelopment would not result in the violation of any state or National Ambient Air Quality Standards ("NAAQS"). The FEIS attributed the region's current ozone non-attainment status to the densely populated urban areas lying to the south of the base. Nonetheless, the FEIS concluded that the proposed action would impact ability of New Hampshire to

achieve the ozone precursor reductions mandated by the 1990 CAA amendments.

On August 14, 1991, the EPA issued comments on the FEIS. *See* EPA FEIS Comments (USAF Ex. 294). The EPA concluded after review of the air analysis contained in the FEIS that "the air impacts were of such a magnitude that they would hinder New Hampshire's ability to achieve the required reductions in emission of ozone precursors and complicate compliance with the Clean Air Act." *Id.* at 3–4. Further, the EPA found that the carbon monoxide ("CO") analysis contained in the FEIS was deficient. The EPA had previously communicated these concerns to the USAF which prompted an additional air quality analysis. That analysis was received by the EPA on July 30, 1991 and specifically addressed the EPA's concerns regarding the Spaulding Turnpike/Gosling Road interchange. Apparently implementation of the project without modification of this interchange would contribute to the projected CO violations. The July 30 analysis evaluated improvements to the interchange which the EPA concluded would result in compliance with the CO NAAQS. *See* EPA August 12, 1991 Memo (EPA Ex. H).

The EPA's comments on the FEIS also addressed the use of the Memorandum of Understanding ("MOU") as a vehicle to address the EPA's air quality concerns. The Pease Development Authority ("PDA"), EPA and the New Hampshire Department of Environmental Services ("NHDES") entered into the MOU on August 1, 1991. The MOU addressed the EPA's air quality concerns by requiring a surface transportation study, a traffic model, a master transportation plan and CO analysis. The MOU required that the PDA not undertake further development beyond the level anticipated to generate 3.3 tons per day of hydrocarbon emissions until the EPA approved a revised New Hampshire State Implementation Plan ("SIP"). The EPA maintained that the MOU provided a framework within which the Pease project could proceed in compliance with the CAA.

In their comments on the FEIS, the EPA also stated that while incorporating the MOU into the Record of Decision ("ROD") would assure compliance with the CAA, it would not satisfy the Air Force's obligation under the National Environmental Policy Act ("NEPA") to "have disclosed in the FEIS critical and relevant information on impacts and mitigation for public review." EPA FEIS Comments at 5 (USAF Ex. 294). The EPA added that the July 30, CO study also raised similar concerns.

On August 20, 1991, the USAF issued an initial ROD. *See* ROD (USAF Ex. 453). The ROD addressed the EPA's air quality concerns by incorporating the MOU into the ROD. The ROD reiterates the USAF's obligation under section 176 of the CAA not to support any activity which fails to conform to an SIP. However, the ROD states that by following the framework established in the MOU the project should be able to proceed in compliance with the CAA.

The ROD also addressed the issue of transfer of contaminated sites. The ROD states that the parcels designated for transfer outside the federal government must be remediated prior to the transfer. The ROD reiterates the requirements of Section 120(h) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") which require that all deeds of transfer contain a covenant warranting that all remedial action has been taken prior to transfer. Remedial action would continue on the retained parcels by establishing easements on the transferred properties or restricting their use. However, the USAF stated that in order to facilitate reuse as early as possible, long term leases would be executed then converted to a transfer by deed upon completion of the remediation process.

In the ROD, the USAF acknowledged that the majority of environmental impacts from the project would occur at a later date as a result of various uses by future owners. The USAF stated that while one of their goals was to minimize the environmental harm, a competing concern was the enhancement of economic development and the restriction of future alternative development choices.

On March 20, 1992, the USAF issued a Memorandum for the Record in which they revisited the CAA compliance issue. *See*

USAF March 1992 Memorandum (USAF Ex. 1). The purpose of the Memorandum was to update the conformity determination contained in the ROD in light of subsequent information. The Memorandum refers to a certification received on February 4, 1992, from Robert Varney Commissioner of the NHDES in which Mr. Varney certified that the project conformed to the New Hampshire SIP. The Memorandum also incorporated a letter of assurance from New Hampshire Governor Judd Gregg.

The Memorandum referred to the MOU as the basis of the conformity determination in the ROD. The Memorandum cited the requirements contained in the MOU, namely the CO monitoring and the assurance that hydrocarbon emissions would not exceed 3.3 tons per day. The USAF stated that this cap would control emissions until the issuance of a revised SIP approved by the EPA.

The Memorandum went on to address in detail the rationale for concluding that the project would not violate the existing or future SIP's. The Memorandum reasoned that the 3.3 tons per day hydrocarbon emissions cap contained in the MOU was far below the emissions level of the Pease base during full operation which complied with the existing SIP. Furthermore, the Memorandum cited the Varney letter in which it was estimated that emission up to year 1997 would reach only 2.5 tons per day, even below the 3.3 ton cap.

In support of the contention that the project would not violate the existing SIP, the USAF reasoned that the existing SIP had been formulated during the full operation of the base and therefore had a "built-in" Pease allowance. This conclusion was reached while acknowledging that the existing SIP could not have accommodated the stationary sources contemplated as part of the redevelopment and the air pollution generated from vehicles would differ from the that of the Pease base during full operation. The Memorandum concluded that these differences would be addressed in the revised SIP.

The Memorandum also addressed the CAA compliance issue. The Memorandum stated that the redevelopment would not cause or contribute to any new standard violations, nor would it delay the timely attainment of any standard. The Memorandum concluded that the only pollutant which would near preexisting levels was ozone but the level of hydrocarbons would not exceed those emitted at Pease prior to 1990 and ozone reducing plans for the region would act to further reduce the ozone levels. The Memorandum stated that the project would meet the NAAQS through the use of a revised SIP.

On April 13, 1992, the USAF issued a Supplement Record of Decision for the Disposal and reuse of Pease AFB See "Supplemental ROD" (USAF Ex. 466). The Supplemental ROD addressed modifications to the transfer of certain parcels of land. The intention to convert leased parcels to deed transfers was reiterated, however the USAF acknowledged that due to the environmental condition of the majority of parcels most would not be available for transfer immediately. The USAF expressed their intention of conveying the same degree of control as would be contained in a deed. Under this arrangement, the PDA would assume control of the property and proceed with the redevelopment as scheduled.

As a result of the modifications made in the Supplemental ROD, the USAF prepared a Preliminary Environmental Survey Form on April 9, 1992. See April 1992 Survey (USAF Ex. 628). The survey concluded that the redevelopment would have an "insignificant" impact on the remedial activities on parcels A, C, D, E, and I. The USAF stated that the transfer documents required the PDA to get written permission for any alterations in construction, thereby precluding an unacceptable risk. The survey was followed by a formal Finding of No Significant Impact for Long–Term Lease ("FONSI") for the aforementioned parcels. See April 1992 Survey (USAF Ex. 628). The FONSI stated that the leases would contain environmental restrictions which would be adequate to protection against the environmental risks. The USAF subsequently signed a 55 year lease to PDA on the parcels.

On March 26, 1992, CLF filed a citizen's suit pursuant to Section 304 of the CAA, 42 U.S.C. § 7604, against the EPA and USAF.

The complaint alleged violations of NEPA and its regulations against the USAF and violations of the CAA against the USAF and the EPA. PDA moved to intervene as a defendant on April 20, 1992. This action was later consolidated with an action filed by the Town of Newington against the USAF, PDA and EPA. The Town of Newington alleged violations of NEPA, CERCLA, the Federal Facilities Agreement and the CAA.

On December 4, 1992, CLF filed a motion to compel disclosure of seven documents withheld from the administrative record by the Federal Defendants on the grounds that they were privileged (doc. # 38). Those documents were EPA records pertaining to the MOU. On January 12, 1993, the Federal Defendants filed a Motion to Amend the Administrative Index to include references to additional documents (doc. # 50). Shortly thereafter on January 28, 1993, CLF filed a second motion to compel seeking to amend the administrative record to include the additional documents. The court examined fifteen documents *in camera* and found that the documents were covered by the deliberative process privilege. On October 4, 1993, the court denied the Motion to Compel but on reconsideration found that several drafts of the MOU which had been disclosed to the PDA were not covered by the privilege. *See* Order on Motion for Reconsideration (doc. # 128).

In the meantime, PDA filed a Motion to Dismiss on January 7, 1993 seeking to dismiss the CAA claims against the EPA. *See* PDA Motion to Dismiss (doc. # 85). On April 4, 1994, the court granted the motion in part, dismissing Count Eighteen for failure to allege a specific violation of either the Maine or New Hampshire SIP.

In their Motion to Dismiss, the PDA also challenged the district court's jurisdiction of the CAA claims pursuant to Section 307(b)(1). PDA asserted that the plaintiffs' claim that the EPA violated the CAA by supporting a project which failed to conform to the New Hampshire and Maine SIPs constituted a final action by the EPA Administrator. Thus, the PDA contended that the proper forum pursuant to 42 U.S.C. § 7607(b)(1) was the First Circuit Court of Appeals. The court found that jurisdiction was properly before the District Court and maintained jurisdiction over the remaining CAA claim against the EPA.

On January 22, 1993, CLF moved for summary judgment which was followed by a Motion for Summary Judgment by the Town of Newington on January 25, 1993. Both motions were stayed pending the disposition of the PDA Motion to Dismiss. Pursuant to a procedural order by this court, the parties filed the following motions. On July 18, 1994, PDA filed a Motion to Dismiss the remaining CAA claims (doc. # 134) and in the alternative, also filed a Motion for Summary Judgment on those same claims (doc. # 135). On July 19, 1994, the Federal Defendants filed a Cross–Motion for Summary Judgment (doc. # 138). The voluminous filings also include statements from each of the plaintiffs and defendants in support of the others' motions, as well as oppositions to motions and various replies and sur-replies.

### Discussion

#### A. Clean Air Act Claims

The goal of the Clean Air Act, first passed in 1955, is to protect and enhance the Nation's air quality, initiate and accelerate a national program of research and development designed to control air pollution, to provide technical and financial assistance to the States in the execution of pollution control programs and to encourage the development of regional pollution control programs. 42 U.S.C. § 7401(b). In 1970, amendments were passed which required the promulgation of National Ambient Air Quality Standards. 42 U.S.C. § 7409. The NAAQS for a particular pollutant is a standard reflecting the maximum concentration level of that pollutant which is necessary to protect public health. 42 U.S.C. § 7409(b).

The EPA has established NAAQS for both ozone and carbon monoxide. 40 C.F.R. §§ 50.8–50.9. Each state has the primary responsibility for assuring air quality within specific geographic areas throughout the state. 42 U.S.C. § 7407. The vehicle by which each state achieves the requisite NAAQS for each criteria pollutant is through submission of a state implementation plan.

*Id.* The SIP must detail the manner in which the NAAQSs will be achieved in the various areas throughout the state. *Id.*

The EPA and the states have designated specific geographic regions throughout each state according to the level of criteria pollutants. 42 U.S.C. § 7407(d)(1)(A). The regions are classified as attainment areas depending on whether the NAAQS for the region have been met. The areas in which the NAAQS have not been attained are known as non-attainment areas, while others are designated as unclassified if there is insufficient data to determine if the NAAQS has been met. An unclassified area is presumed to be in compliance with the NAAQS for the criteria pollutant until there is sufficient data to classify it otherwise. *Id.*

The Portsmouth–Dover–Rochester area in which the Pease project is located is designated as a serious non-attainment area for ozone. 40 C.F.R. 81.330 (1993). With regard to carbon monoxide, the area has not been designated. *Id.* The deadline for achievement of the NAAQSs for proper ozone levels in serious non-attainment areas is November 15, 1999. 42 U.S.C. § 7511(a)(1).

The most recent amendments to the CAA occurred in 1990. The 1990 amendments established interim milestones to insure reasonable progress toward achievement of the NAAQS for ozone. 42 U.S.C. § 7511a. The amendments require interim reductions in hydrocarbon emissions or volatile organic compounds ("VOCs"). 42 U.S.C. § 7511a(c)(2)(B). States are required to make SIP revisions which reflect reasonable further progress toward NAAQS attainment. *Id.* Failure to do so may result in sanctions by the EPA. 42 U.S.C. § 7509.

The 1990 Amendments also included the formation of an ozone transport region designed to control interstate ozone air pollution. 42 U.S.C. § 7511c(a). The transport region encompassed the state of New Hampshire. Each state located within the transport region is required to submit additional SIP revisions which address VOC levels. 42 U.S.C. § 7511c(b).

Also included in the 1990 Amendments was a revision of Section 176(c)(1), the Conformity Provision. Section 176(c)(1) provides that:

No department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title.... The assurance of conformity to such an implementation plan shall be an affirmative responsibility of the head of such department, agency or instrumentality.

42 U.S.C. § 7506(c)(1).

The Act goes on to define conformity to an implementation plan as:

(A) conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and

(B) that such activities will not

(i) cause or contribute to any new violation of any standard in any area;

(ii) increase the frequency or severity of any existing violation of any standard in any area; or

(iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

*Id.*

The CAA places an affirmative responsibility on the agency to conform to the state plan and requires that the conformity determination be based on the most recent estimates of emission and further requires that those estimates be derived from "the most recent population, employment, travel and congestion estimates as determined by the metropolitan planning organization or other agency authorized to make such estimates." *Id.*

Defendant Pease Development Authority filed a Motion to Dismiss all remaining Clean Air Act claims against the Air Force and the EPA. In the alternative, PDA seeks summary judgment on those counts the court does not dismiss. The PDA asserts that the

CAA claims against the USAF should be dismissed on the same basis that the CAA claim was dismissed against the EPA.

In Count Eighteen of their complaint, CLF alleged that the EPA violated the Conformity Provision of the CAA by supporting a project which failed to conform to the purpose of the Maine or New Hampshire SIP. The court dismissed this count, holding that it was not sufficient merely to allege a violation the "purpose" of an SIP. *See* Order on Motion to Dismiss (doc. # 122). The court held that in order to state a claim under the CAA, the plaintiff was required to state a specific provision of either the Maine or New Hampshire SIP that would be violated by the Pease project. The general aims and goals of a state implementation plan are not enforceable beyond the specific provisions of the plan which support those goals. *Id.; see also Wilder v. Thomas,* 854 F.2d 605, 613 (2nd Cir.1988); *Action for Rational Transit v. West Side Highway Project,* 699 F.2d 614, 616 (2nd Cir.1983).

CLF has filed six CAA violations against the USAF. In Count Twelve, CLF alleged that the USAF violated Section 176(c)(1) of the CAA by supporting a project which failed to conform to the purpose of the New Hampshire SIP. CLF alleged that the Pease project would "increase the frequency and severity of existing violations of the ozone standard in the Portsmouth–Dover–Rochester, New Hampshire serious ozone non-attainment area." CLF Complaint at 64. Count Thirteen is identical to the prior count except CLF alleged a violation of the purpose of the Maine SIP. In Count Fourteen, CLF again alleged a violation of the purpose of the New Hampshire SIP through an increase in the severity and frequency in violations of the CO standard.

In Count Fifteen of the complaint, CLF alleges that the USAF violated the Conformity Provision of the CAA by proposing mitigation measures which in essence exempts the USAF from compliance with the CAA. CLF estimates that at full build-out the project will produce 7.5 tons per day of hydrocarbons and 35 tons per day of carbon monoxide. The MOU permits an emission level of 3.3 tons per day of hydrocarbons until such time

as New Hampshire develops a new SIP. CLF reasons that this measure places the burden of compliance with the CAA on the state in the development of the SIP and not on the USAF where it properly belongs. CLF asserts that the mitigation measures contained in the MOU do not address the interim reduction requirements mandated by the CAA and improperly restrict the conformity determination to only a preliminary phase of the project.

In Count Sixteen, the CLF asserts that air analysis conducted by the USAF and which formed the basis of their conformity determination is inadequate. CLF further challenges the basis of the conformity determination in Count Seventeen. There is one remaining CAA count against the EPA in which CLF alleges that the EPA failed to make a conformity determination as required by 42 U.S.C. § 7506(c)(1). *See* CLF Complaint at 70. In their complaint, the Town of Newington asserts that both the USAF and the EPA violated the CAA by supporting the Pease project. Newington asserts that the increase in pollutants resulting from the Pease project will violate both the Maine and New Hampshire SIPs. Newington Complaint at 13.

In their Motion to Dismiss, PDA asserts that the remaining CAA claims against the defendants should be dismissed on the same grounds that the court dismissed Count Eighteen. PDA contends that each of the six CAA claims against the USAF likewise either directly or impliedly assert only general violations of an SIP rather than a specific requirement or provision. Accordingly, PDA asserts that CLF has failed to state a claim under the CAA. PDA is partially correct in their assertion.

Counts Twelve, Thirteen, Fourteen and Fifteen essentially duplicate the allegations made by CLF in Count Eighteen against the USAF. CLF asserts that the USAF and the EPA violated the Conformity Provision of the CAA by supporting a project which failed to comply with the Maine or New Hampshire SIPs. CLF further alleges that the mitigation measures contained in the MOU were inadequate for the same reasons. Likewise, the CAA claim made by Newington is sub-

stantively analogous to the CLF claims. Essentially, Newington asserts that both the Maine and New Hampshire SIPs will be violated by the Pease project. However, Newington's CAA claim suffers from the same deficiency as the CLF claim against the EPA. Newington has failed to assert the violation of a specific provision of either SIP.

In their Motion to Dismiss, PDA again attacks this court's jurisdiction over the CAA claims. As the court has already disposed of this issue in its Order on PDA's Motion to Dismiss and again in the context of motion for reconsideration, this issue will not be entertained for a third time. Accordingly, the court hereby dismisses CLF Counts Twelve, Thirteen, Fourteen and Fifteen and Newington Count III for the same reasons as contained in the court's Order on PDA's Motion to Dismiss. However, the court finds that in the remaining claims against the USAF, CLF has stated a claim for relief under the CAA. Consequently, those claims should be appropriately considered in the context of the parties' motions for summary judgment.

Summary judgment is proper only if, viewing the record in the light most favorable to the non-moving party, the documents on file disclose no genuine issue of material fact. The moving party is then entitled to judgment as a matter of law. *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988); Fed.R.Civ.P. 56(c). "Only disputes over facts that might affect the outcome of the suit" are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.; Oliver*, 846 F.2d at 105. The moving party must initially "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the moving party has made the required showing, the adverse party must "go beyond the pleadings" and designate specific facts to demonstrate the existence of genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553; *Oliver*, 846 F.2d at 105; Fed.R.Civ.P. 56(e).

In the remaining CAA claims, the plaintiffs challenge the conformity determinations made by the USAF and the EPA. The plaintiffs raise both procedural and substantive violations of the Conformity Provision of the CAA. First, the plaintiffs assert that the EPA failed to make conformity findings as required by 42 U.S.C. § 7506(c)(1). Second, the plaintiffs assert procedural and substantive challenges to the conformity determination made by the USAF.

■ In their Motion for Summary Judgment, CLF contends that the EPA violated the Conformity Provision of the CAA by failing to make an independent conformity determination. CLF contends that EPA's conformity responsibilities were triggered as a party to the MOU. Assuming without finding that entering into the MOU constituted "support" of the project and thus necessitated a conformity determination, there is ample evidence in the record to support PDA's contention that the EPA in fact did make conformity findings. *See* EPA DEIS Letter at 12–13 (USAF Ex. 212) (EPA findings that air quality analysis is inadequate); EPA FEIS Letter at 3–4 (USAF Ex. 294) (EPA finding that project will have problems and complicate CAA compliance); EPA August 12, 1991 Memo (CLF Ex. H) (EPA finding following July 30, 1991 air analysis that project would comply with CO NAAQS). The PDA contends that the EPA relied on analysis conducted by the USAF in formulating their opinions however, PDA fails to cite any authority which would compel the EPA to conduct independent research. Accordingly, the court grants summary judgment in favor of the EPA on Count Nineteen.

■ CLF also asserts that the USAF failed to make conformity determinations relative to the Maine SIP. CLF contends that this failure is a per se violation of 42 U.S.C. § 7506(c)(1)(B)(ii) & (iii). These sections of the Conformity Provision define conformance to an implementation plan as an activity which does not violate "any standard in any area" and does not "delay timely attainment of any standard or any required interim emission reductions or other milestones in any area." 42 U.S.C. § 7506(c)(1)(B)(ii) & (iii). CLF asserts that the plain language of

the statute mandates a conformity finding relative to any area affected by the Pease project.

CLF asserts that by prohibiting violations of "any standard in any area" the CAA amendments mandate conformity findings for any area affected by the Pease project including Maine. However, the language in 176(c) is ambiguous at best. At the time the USAF was formulating its conformity determination, there were no EPA conformity regulations available for guidance. Accordingly, the USAF was guided solely by the statutory language.

PDA points out that the Conformity Provision does not define what is meant by "any standard in any area" and urges that the USAF was correct in construing that language to apply solely to the SIP of the state in which the project is located. Furthermore, PDA points to language in the Conformity Provision and elsewhere in the CAA to support the USAF statutory construction. *See* PDA Memo at 23–26. PDA cites the first sentence of the Conformity Provision which prohibits support of any activity which fails to conform to "an implementation plan" alleging that the language should be construed to denote only the implementation plan in the state where the project is located. However, this language is equally ambiguous. Accordingly, in providing the substantial deference required to USAF's actions under the CAA the court concurs in the USAF statutory interpretation.

■ In their Motion for Summary Judgment, CLF asserts that the USAF also violated the Conformity Provision by failing to make a specific conformity determination prior to their approval of the project. CLF asserts that the plain language of the Conformity Provision dictates that a conformity determination be made prior to the issuance of the 1991 ROD, the action which CLF asserts constitutes "support" of the project in violation of the Act. *See* CLF Reply at 31. The PDA disputes this assertion.

PDA contends that neither the content nor the timing of the USAF conformity determination violates the CAA. The USAF made its final conformity determination in the form of a Memorandum for the Record based on analysis made subsequent to the FEIS. This Memorandum was issued on March 20, 1992. On April 13, 1992, the USAF issued the Supplemental ROD in which the USAF made its final decisions concerning the transfer of the remaining property. Thus, PDA asserts that the USAF's final conformity determination was made subsequent to its final determination concerning property transfers and the ultimate transfer of the property via long term lease.

The question presented to the court on this issue is largely one of semantics. The plaintiffs assert that the USAF made an initial move to "support" the Pease redevelopment project prior to issuing a final conformity determination. However, PDA acknowledges that the USAF did make reference to its conformity obligations pursuant to the CAA in the August 1991 ROD, the same document which CLF asserts constitutes USAF's initial support of the project. CLF Memorandum Supporting Motion for Summary Judgment at 68.

CLF does not cite any authority to support their contention that a final conformity determination must be made prior to any action connected to the project. The Administrative Record supports the PDA's assertion that the process was one which was ongoing. As the USAF took action calculated to move the redevelopment project forward, the EPA issued comments criticizing the air quality analysis and the USAF's responsibility pursuant to the CAA. *See supra* p. 270–271. As a result of the EPA's comments, the USAF conducted further analysis which ultimately formed the basis for their conformity determination contained in the Memorandum for the Record issued March 20, 1992. The court finds that the procedures followed by the USAF in issuing their conformity determination satisfy the procedural requirements of the CAA.

■ CLF next challenges the substance of the USAF conformity determination asserting violations of 42 U.S.C. § 7506(c)(1)(A) & (B). The CAA does not establish a standard of review for actions by either the EPA or the USAF. Therefore, the appropriate standard of review is set forth in the Admin-

istrative Procedure Act. 5 U.S.C. §§ 701–706. The Act provides that a court shall set aside an agency decision which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with Law ..." 5 U.S.C. § 706; *see also Town of Norfolk v. U.S. Army Corps of Eng'rs,* 968 F.2d 1438, 1446 (1st Cir.1992); *National Wildlife Federation v. Hanson,* 859 F.2d 313, 316 (4th Cir.1988). In determining whether the agency's action was arbitrary and capricious, the court must determine whether the agency considered all relevant factors and whether there has been a "clear error of judgment." *Town of Norfolk v. U.S. Army Corps of ·Eng'rs,* 968 F.2d at 1445–46 (citing *Citizens to preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 417, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)). The arbitrary and capricious standard should be construed narrowly and the court is not permitted to substitute its opinion for that of the agency. *Id.* In particular, administrative actions pursuant to the CAA and NEPA and are subject to a "highly deferential abuse of discretion standard." *Conservation Law Foundation v. Federal Highway Administration,* 24 F.3d 1465, 1471 (1st Cir.1994) (citations omitted).

As stated by Robert Varney, Commissioner of NHDES in his letter to Gary Vest, Deputy Assistant Secretary for the Environmental Safety and Occupational Health at the USAF, the inquiry required by Section 176(c)(1) in rendering a conformity determination is not at all clear. *See* Varney Letter at 3 (USAF Ex. 3). At the time the USAF made the conformity determination, the EPA regulations interpreting the Conformity Provisions were not yet in place. Consequently, the statute itself was the only form of guidance. As Mr. Varney stated, three conformity possibilities existed:

(1) the federal agency need only determine that the proposed activity is in conformance with the terms of the existing SIP; (2) the determination must address the three elements set forth in § 176(c)(1)(B) air quality impacts separately, regardless of the terms of the SIP; or (3) Congress intended the full determination to await adoption by the state of the new SIP mandated by the 1990 revisions to Title I of the CAA. *Id.*

■ PDA argues that the correct statutory construction is one which requires adherence to the terms of the existing SIP. However, CLF attacks the substance of USAF's conformity findings on the grounds that they fail to comply with the three separate elements set forth in Section 176(c)(1). For the reasons stated below, the court concurs with the PDA statutory analysis.

CLF contends that the conformity findings rendered by the USAF failed to conform to purpose of the New Hampshire SIP to eliminate or reduce the severity and number of violations of the NAAQS and to achieve their timely attainment as required by 42 U.S.C. § 7506(c)(1)(A). CLF contends that the USAF applied an incorrect legal standard by determining in the March 1992 Memorandum for the Record that the Pease project would conform to the existing New Hampshire SIP and therefore its purpose. CLF maintains that the 1990 CAA amendments require a conformity determination which goes beyond finding that a project conforms to the current SIP. Instead, CLF asserts that the USAF is required to issue conformity findings which demonstrate that the project adhered to the purpose of the current SIP, that is the reduction of current NAAQS violations and their timely attainment. CLF further asserts that far from achieving the purpose of the New Hampshire SIP, the project would hinder compliance with the CAA. *See* CLF Memorandum at 75, n. 70. ·

The Conformity Provision of the CAA specifically requires that no government agency support a project which fails to conform to a state implementation plan. 42 U.S.C. § 7506(c)(1). The statute places the determination of conformity as an affirmative responsibility on the head of the federal agency. The statute goes on to define conformity to an SIP as one which consistent with the goal to reduce the number and severity of NAAQS violations.

As stated above, the state implementation plan is the vehicle by which states adhere to the NAAQS. *See supra* p. 273. An SIP contains specific measures by which this goal

is attained. Failure to adhere to those specific measures which in turn are calculated to enforce the NAAQS, is subject to a Section 304(a)(1)(A) citizens suit.

Plaintiffs challenge the adequacy of the USAF conformity determination asserting that it fails to conform to the purpose of the existing SIP to reduce the frequency and severity of NAAQS violations. However, plaintiffs fail to assert that the conformity determination violates the existing SIP. If the conformity finding does not violate specific measures in the existing SIP it naturally follows that it could not violate its purpose. The defendants have amply demonstrated in the Administrative Record that the project is in conformance with the existing SIP and the plaintiffs have not disputed this issue.

While the court finds that the PDA statutory construction is reasonable, the court recognizes that the SIP existing at the time of the USAF conformity determination would not contain any measures calculated to assure compliance with 1990 Amendments since the SIP predated the amendments. As a result, the USAF should arguably have been required to include in its conformity findings a determination as to whether the project will conform to the interim reduction requirements. Accordingly, the court will conduct a review of each of the subsections of 176(c)(1).

In issuing their conformity findings the USAF relied on the recommendations made by the NHDES concerning the project's compliance with the CAA. In their analysis, the NHDES made a separate conformity determination relative to each subsection of Section 176(c)(1)(B) the analysis which CLF argues is the correct one. The NHDES then determined that the project would not result in any additional NAAQS violations or delay their timely attainment. *See* Varney Letter at 5 (USAF Ex. 3).

CLF first challenges the USAF conformity determination on the grounds that the project fails to conform to the purpose of the New Hampshire SIP because it will result in an increase in the frequency and severity of ozone NAAQS violations in violation of 42 U.S.C. § 7506(c)(1)(B)(ii). CLF points to the FEIS stating that hydrocarbon emissions will increase over 1364% following full build out resulting in an increase in the severity of existing ozone standard violations. *See* CLF Memo at 77. This reasoning is flawed on several grounds.

CLF argues that the relevant emissions baseline date for assessing whether the project will conform was not the period when the Pease base was in full military operation but rather after the base closure and prior to the commencement of the redevelopment. While PDA argues that pre–1990 emissions are the proper baseline comparison, it also notes that emission comparisons were made to 1990 data, a year in which Pease had begun to scale down its operations. *See* PDA Memo at 40; Varney Letter (USAF Ex. 3). The conclusions reached by Robert Varney, Commissioner of the NHDES, state that the emission projections for the Pease project through 1997 will be virtually identical to the 1990 ozone level, 2.5 tons per day. This level is significantly less than the normal activity level at Pease during its full military operation. Consequently, the project even in the event that the proper baseline was comparison to 1990 ozone levels, the evidence in the record supports the conclusions that the project will conform.

CLF also asserts that the increased emissions will delay the timely attainment of the ozone standard and in fact cause new violations in contravention of 42 U.S.C. §§ 7506(c)(1)(B)(ii)–(iii). However, there is substantial evidence in the record to support USAF's conclusion that the project will result in no new NAAQS violations. *See* March 1992 Memorandum at 4 (USAF Ex. 1); MOU at 5 (USAF Ex. 308). The NHDES concluded that when judged against historical data of the base either at full military operation or at 1990 ozone levels, the project was expected to produce no new standard violations. Varney Letter at 8 (USAF Ex. 3). Considering the substantial deference the court must accord an agency in reviewing their action pursuant to the CAA, the court finds that the USAF conformity determination as to ozone levels was not arbitrary or capricious.

CLF next challenges the USAF conformity findings as to carbon monoxide. CLF asserts that the evidence contained in the July 1991 CO analysis indicated that the project would cause new violations after the year 2000. PDA disputes this assertion.

The July 30, 1991 CO analysis revealed CO NAAQS exceedences for the years 1991, 1995, 2010 and perhaps the year 2000 as well. EPA FEIS letter at 4 (USAF Ex. 294). However, the analysis showed that the construction of the new Spaulding Turnpike/Gosling Road interchange would bring the project into compliance through the year 2000. The study noted that CO exceedences would still exist after the year 2000 however, mitigation measures designed to address the CO exceedences were contained in the MOU. *Id.*

The MOU contains several measures designed to insure compliance with the CO NAAQSs after the year 2000. *See supra* p. 271. The MOU calls for various analysis and remedial measures to be taken. In the event that those mitigation measures do not act to cap CO emissions within the range mandated by the NAAQS, the MOU requires that PDA not undertake any further development beyond that anticipated to generate 3.3 tons per day of hydrocarbon emissions. This construction moratorium is effective until a revised SIP is developed which in itself is required to insure NAAQS compliance. In consideration of the deference with which the court is required to review agency decisions under the CAA, the court does not find the USAF conformity determination with regard to CO levels to be unreasonable.

CLF makes further challenges to what it calls the USAF's "post hoc rationalizations" to excuse its failure to comply with the Conformity Provision. CLF Memo at 83. CLF challenges the use of the MOU as a mitigation measure for the project's air emissions. CLF disputes the hydrocarbon emission cap of 3.3 tons per day placed on the project prior to approval of the 1993 New Hampshire SIP on the grounds that the MOU allows a higher emission rate than the project is expected to emit. CLF also contends that the MOU fails to impose a post SIP emission cap.

PDA defends the use of the MOU as a mitigation measure for hydrocarbon emissions. PDA explains that at the time the MOU was formulated, the project was expected to emit up to 3.3 tons per day of hydrocarbons. However, as further air analysis was conducted that estimate was lowered to 2.5 tons per day. Even at the higher rate of 3.3 tons per day, the emission rate is in compliance with the existing SIP and the lower rate is approximately commensurate with the 1990 emission level at Pease. March 1992 Memorandum at 3 (USAF Ex. 1). PDA has amply demonstrated in the record, that even at the higher projected emission rate, the project complied with the existing SIP and thus with the CAA Conformity Provision.

CLF also asserts that the USAF violated the CAA by "delegating its federal conformity responsibility to the state of New Hampshire SIP process." CLF Memo at 85. CLF contends that the USAF impermissibly delegated its statutory responsibility by leaving the accountability for future emission levels to the SIP process. CLF Memo at 86. However, CLF's argument fails to accurately portray the SIP process.

As stated above, emission levels for the project have been capped at 3.3 tons per day until such time as a new SIP is approved. The 3.3 ton per day cap is for an indefinite time period insuring compliance to the existing SIP per the requirements of the CAA. The CAA has specifically mandated revisions to SIP's to insure interim monitoring of VOCs and ozone levels for serious non-attainment areas such as the Portsmouth–Dover–Rochester are where the Pease project is located. *See* 42 U.S.C. § 7511a(c). Accordingly, it is the plain language of the CAA which relegates the responsibility of compliance to SIP.

CLF further challenges that the USAF impermissibly minimized the scale of the project in order to insure its compliance with the CAA. CLF Memo at 89. CLF charges that the USAF only considered the first phase of the project when the emission levels would be substantially less than full build out. However, CLF's arguments fail to

take into account the 3.3 emission cap on the project. By the terms of the MOU, PDA is precluded from continuing construction if the emission level is calculated to exceed 3.3 tons per day. If the emissions are calculated to exceed 3.3 tons per day at full build out, PDA is precluded from continuing construction until such time as the higher emission levels are considered within the context of the new SIP. The new SIP is required to consider any increased emission levels at Pease while designing a strategy to bring the Portsmouth–Dover–Rochester area into NAAQS compliance. Should the SIP fail in this goal, CLF may challenge the newly revised SIP.

The court hereby grants summary judgment on the remaining CAA claims in favor of the defendants. The court has not specifically addressed in this order all arguments raised by the plaintiffs however all issues have been considered. The court does not consider the arguments raised by either party in relation to the EPA' Final Rule on Determining Conformity of General Federal Actions to State or Federal Implementation Plans, 58 Fed.Reg. 63214–63259 (1993), as the new regulation was not effective until November 30, 1993 and thus was not applicable to this action.

## B. NEPA Claims

The National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347, was enacted to ensure that federal agencies consider in their respective decision making process, the environmental impact of their actions. *See Calvert Cliffs' Coordinating Committee, Inc. v. AEC,* 449 F.2d 1109, 1113 (D.C.Cir.1971); *Appalachian Mountain Club v. Brinegar,* 394 F.Supp. 105, 113 (D.N.H.1975). Section 101 sets forth the Act's basic policy to use "all practicable means and measures ... to create and maintain conditions under which man and nature can exist in productive harmony...." 42 U.S.C. § 4331(a). The Act charges governmental agencies with the responsibility to use all means practicable to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences...." 42 U.S.C. § 4331(b). The aim of NEPA is to reorder priorities in which environmental costs and benefits assumed their proper place in governmental decision making along with other considerations. 449 F.2d at 1112.

The procedural requirements of NEPA impose upon the appropriate federal agency the obligation to complete an environmental impact statement for any major federal action with significant impact on the environment. 42 U.S.C. § 4332. This statutory requirement serves two purposes. First it ensures that the agency in reaching its decision will have detailed environmental information available and will consider that information in the process of making their decision. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1988). It also guarantees that the relevant environmental information will be made available to wider audiences allowing the public to play a role in the decision making process. *Id.; see also City of Boston v. Volpe,* 464 F.2d 254, 257 (1st Cir.1972).

NEPA requires that an EIS contain a detailed written statement concerning the environmental impact of the proposed action which includes:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between the local short-term uses of man's environment and the maintenance and enhancement of long term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C).

Specific guidance for complying with NEPA is provided in the regulations promulgated by the Council for Environmental Quality ("CEQ"), an agency established by NEPA. *See* 40 C.F.R. Part 1500. The CEQ regulations enumerate which actions require an EIS and the appropriate agency charged with its preparation. *See* 40 C.F.R. §§ 1502,

1508. This decision may require the preparation of an environmental assessment, a concise public document providing sufficient evidence whether an EIS is necessary or a finding of no environmental impact. 40 C.F.R. §§ 1501.4(a)-(c); 40 C.F.R. § 1508.9(a).

The regulations require that the environmental impact be discussed in proportion to their significance. 40 C.F.R. § 1502.2(b). An EIS must contain a discussion of the various alternatives considered and how the project is calculated to achieve the requirements of Section 101 and 102(1) of the Act. 40 C.F.R. § 1502.2(d). The agency must also state whether all practical means to avoid or minimize environmental harm have been adopted and if not, why not. 40 C.F.R. § 1505.2(c). The EIS must establish a monitoring and enforcement program for any mitigation. Id. The EIS is calculated to serve as a means of assessing the environmental impact of a proposed agency decision rather than justifying a decision already made. 40 C.F.R. § 1502.2(g).

The CEQ regulations specify the EIS process requiring compilation of a draft EIS, final EIS and where necessary a Supplemental EIS. 40 C.F.R. § 1502.9. The DEIS must cover all major points of environmental impact and to the extent possible it must satisfy the same requirements as a FEIS. 40 C.F.R. § 1502.9(a). If the draft is inadequate, the agency must circulate a revised document.

After compiling the DEIS and before the issuance of the FEIS, the agency compiling the EIS must request comments from the public, affirmatively soliciting comments from interested parties or organizations. 40 C.F.R. § 1503; 40 C.F.R. § 1502.9(b). The agency must address those comments in the FEIS and respond to any responsible opposing view. A Supplemental EIS is necessary where the agency makes a substantial change in the proposed action which has relevant environmental concerns or significant new circumstances arise or new information becomes available. 40 C.F.R. § 1502.9(c)(1). An agency is permitted to issue a Supplemental EIS where the pur-

poses of the Act will be furthered. 40 C.F.R. § 1502.9(c)(2).

The Air Force has also promulgated regulations specifying an environmental impact analysis process which incorporate the EIS procedures under NEPA. See 32 C.F.R. § 989.1; 32 C.F.R. § 989.12. The regulations acknowledge that base closures may present special environmental considerations. 32 C.F.R. § 989.4. The regulations detail a sequential process similar to the EIS process in the CEQ regulations. Like the CEQ regulations, the USAF regulations mandate that a Supplemental EIS be prepared any time there are substantial changes in the project that would affect the environment or when there are new circumstances or new environmental information becomes available. 32 C.F.R. § 989.12(h). The regulations also require that all measures proposed to minimize or mitigate significant environmental impacts must be identified in the FEIS. 32 C.F.R. § 989.12(i).

The standard of review used by the court in examining an agency decision under NEPA is the same as that used in reviewing a decision under the CAA. See supra pp. 277–278. The court must accord the agency decision substantial deference and set it aside only upon a showing that it was arbitrary and capricious. As discussed above, the court may not substitute its judgment for that of the agency's. Moreover, in reviewing the adequacy of the FEIS the court must employ a "rule of reason" test by evaluating whether or not the decision to include information in the FEIS was reasonable under the circumstances. *Commonwealth of Mass. v. Watt*, 716 F.2d 946, 948 (1st Cir.1983). It is in this light that the court reviews the plaintiffs' challenges to the USAF FEIS.

The majority of the NEPA claims are addressed by Plaintiff CLF in their Memorandum in Support of the Motion for Summary Judgment (doc. # 54) and the Federal Defendants in their Memorandum (doc. # 138). CLF attacks the adequacy of the FEIS on several basis. The court will address the primary arguments raised by CLF in their Memorandum, however those arguments not

specifically addressed in this order have likewise been considered.

■ The Federal Defendants raise an initial challenge to the plaintiffs' NEPA claims arguing that they are barred by the Base Closure and Realignment Act ("BCRA"). 10 U.S.C. § 2687 note. The 1988 Act under which the Pease base was closed, provided for NEPA challenges for actions taken during the process of closing and realigning a military installation and actions taken during the process of relocation. *See* 10 U.S.C. § 2687. As a deterrent against actions brought to delay base closings, the 1988 BCRA explicitly exempted from NEPA challenges the decision as to which bases were to be closed. *See* H.R.Conf.Rep. No. 1071, 100th Cong., 2d Sess. 23 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3395, 3403.

The defendants assert that the NEPA claims are barred because the BCRA requires the filing of a NEPA challenge to an act or omission by the Secretary within sixty days. The defendants contend that the plaintiffs' NEPA claims essentially challenge the adequacy of the FEIS and therefore must have been filed within sixty days from the issuance of the FEIS. CLF on the other hand asserts that the BCRA does not place any time limits on NEPA claims which assert challenges to actions subsequent to the base closures.

The court believes that the CLF statutory interpretation is the correct one. The sixty day limit to NEPA claims is expressly applicable to those claims challenging the actions of the Secretary either during the process of closing the base or during the process of relocating the base. *See* 10 U.S.C. § 2687(b)(1) & (2). An examination of the Legislative History reveals that Congress intended the sixty day time limit to apply only those actions which used NEPA to challenge the base closure itself. In discussing the NEPA application to base closures, the House Conference Report states:

The conferees recognize that the National Environmental Policy Act has been used in some cases to delay and untimely frustrate base closures, and support the narrowing of its applicability for closures and realignments under this act. However, they also believe that the NEPA goals of public disclosure and clear identification of potential adverse environmental impacts, as well as mitigating measures available to the decision maker, should be protected.

While the Commission has been directed in its chapter to consider potential environmental consequences in developing its closure and realignment recommendations, neither the Commission nor the Secretary of Defense are required to perform a complete, public environmental analysis process prior to making their recommendations and decisions. The conferees expect that the Department of Defense will conduct the analyses required by the NEPA after the Secretary has made his decision on the closure or realignment of an installation. The focus of this analysis has been narrowed to the specific environmental impacts upon the gaining and losing locations, and the mitigating measures available to the Secretary. The opportunity to bring civil action for judicial review would be limited to 60 days.

H.R.Conf.Rep. No. 1071, 100th Cong., 2d Sess. 23 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3395, 3403.

In the instant action, the plaintiffs are challenging actions by the USAF which took place well after the decision to close Pease. The sixty day limit is applicable to only those actions which challenge the actions taken either during closure or realignment. As the Legislative History indicates, the sixty day limit was established to frustrate attempts to use NEPA as a means to delay base closures not to prohibit challenges to environmental decisions made subsequent to the closure and realignment of a base.

The complaints filed by the plaintiffs do not challenge the closure of the base but the development plans following its closure. The plaintiffs are using NEPA to mount a challenge to the EIS process not dispute the decision to close the base. Neither plaintiff has asserted a claim against the initial FEIS which dealt solely with the decision to close the Pease base. It is the subsequent FEIS which deals with the disposal and reuse of the land which is the subject of the instant

action and thus is not subject to the sixty day limitation.

▮ CLF first attacks the adequacy of the FEIS on the grounds that it failed to address the full scope of environmental costs and benefits relative to ozone precursor emissions. CLF asserts that the FEIS was inadequate because it did not contain a discussion concerning the ability of New Hampshire and Maine to comply with emission reduction requirements mandated by the 1990 CAA amendments even though such a discussion was requested by CLF in their comments on the DEIS. CLF argues that the FEIS should have included an explanation describing the manner in which the states would achieve the CAA mandated interim emission reductions.

Specifically, CLF contends that the FEIS air quality analysis was inadequate because it failed to contain an analysis of the "USAF's 'conformity' obligations; how the statutory deadlines would be affected; whether the project was in compliance with the state SIP; or the costs and benefits of the new emission on other existing and future sources of regulated emissions." CLF Memo at 38. CLF asserts that instead of an explanation of how the project would comply with the CAA amendments, the FEIS merely contained a statement that the project would impact the State's plans to achieve the ozone precursor pollutant reductions mandated by the CAA amendments. *See* FEIS at 4–112 (USAF Ex. 299).

The Federal Defendants dispute the inadequacy of the FEIS claiming that the USAF conformity determination satisfied all requirements under NEPA relative to the air quality issues. CLF claims the use of the MOU to discuss the project's compliance with the NAAQSs was inadequate under NEPA. CLF contends that this discussion should have occurred during the FEIS process when it would have been subject to public review. Instead, CLF contends that the manner in which the CAA compliance discussion occurred violated the public disclosure requirements of NEPA.

▮ As discussed above, the court found that the conformity determination by the

USAF satisfied the Conformity Provision of the CAA. *See supra* p. 279. Consequently, the issue now before the court is whether that conformity determination satisfied the procedural requirements of NEPA. In doing so, the court is obligated to consider the entire administrative record and not only the DEIS, FEIS and the accompanying comments. *Silva v. Lynn*, 482 F.2d 1282, 1282 (1st Cir.1973).

The USAF in issuing its conformity findings determined that the Pease project would conform to the 1990 CAA amendments mandating interim hydrocarbon emission reduction. Essentially, the USAF reached this conclusion as a result of data provided following the FEIS. In both their comments on the DEIS and FEIS, the EPA was highly critical of the USAF's air quality analysis and pessimistic about the project's ability to conform to the CAA. Furthermore, the FEIS itself concluded that "[t]he proposed action will impact the State's plans to achieve federally mandated reductions of ozone precursor pollutant reductions mandated by the Clean Air Act Amendment of 1990." FEIS at 4–112 (USAF Ex. 299). As result, the EPA proposed that the MOU which contained mitigation measures designed to bring the project into CAA compliance, be attached to the ROD to insure that those mitigation measures were implemented.

The USAF responded to the EPA air quality criticism by entering into the MOU on August 1, 1991. The MOU was later incorporated into the ROD thereby alleviating the CAA conformity concerns. However, while the Conformity Provision may have been satisfied by these actions the NEPA requirements were not.

The procedural requirements of NEPA mandate that the USAF prepare an EIS detailing all relevant environmental information prior to a decision. 464 F.2d at 257. This requirements acts to serve the underlying purpose of NEPA to disseminate the environmental information surrounding a particular agency decision and allow public comment prior to the final decision. The decisions made regarding the conformity of the project to the CAA amendments followed the EIS process and thus were never subject

to the public comment. The EPA in their August 14, 1991 comments on the FEIS opined that this lack of public review constituted a violation of the NEPA public disclosure requirements. FEIS Letter at 5 (USAF Ex. 294).

Further, CEQ regulations require that the USAF address any responsible opposing point of view. CLF asserts that the USAF failed to address in the FEIS comments made on the DEIS by both CLF and the EPA, specifically the air quality issues. In their comments on the DEIS, CLF specifically addressed CAA compliance and requested that the USAF address the issue in the FEIS. *See* CLF FEIS Letter at 3 (USAF Ex. 128). The Federal Defendants assert that as a result of CLF's comments on the DEIS further air analysis was conducted and the information included in the FEIS. *See* Federal Defendants' Memo pp. 57–63. Nevertheless, despite the further air quality analysis, the USAF still concluded in the FEIS that while the project was not expected to generate any NAAQS violations it would impact the state's ability to comply with the CAA amendments. *See* FEIS at 4–112 (USAF Ex. 299). This conclusion differed from the information contained in the ROD and the MOU which state that the project, as a result of the mitigation measures contained in the MOU, would in fact comply with the CAA.

CEQ regulations specifically provide for the issuance of a Supplement EIS where significant new circumstances arise or new information becomes available. 40 C.F.R. § 1502.9(c)(1). The methods by which the USAF chose to conform to the CAA should have been the subject of a Supplemental EIS. Accordingly, the court finds that the USAF violated NEPA by failing to discuss CAA conformity in the FEIS.

■ CLF also attacks the FEIS as inadequate on the grounds that it failed to include a discussion of July 30, 1991 CO study. CLF notes that the EPA agreed that the failure to include the CO analysis in the FEIS constituted a violation of the NEPA public disclosure requirements. EPA FEIS Letter at 5 (USAF Ex. 294). For the reasons stated above, the court agrees that the failure to include the CO analysis in the FEIS or issuance a Supplemental EIS including the CO analysis constitutes a NEPA violation.

CLF further attacks the FEIS on the grounds that it failed to adequately address the ozone impact on the state of Maine. CLF asserts that because of the close proximity to the project, the FEIS should have contained a discussion on the impact of the project's emissions on Maine's air quality and the state's ability to comply with the CAA. However, as the court previously concluded, the USAF was not required to make a conformity determination regarding the state of Maine. *See supra* pp. 276–277. Consequently, the FEIS is not deficient in not discussing CAA compliance.

■ The Federal Defendants contend that the air quality impact on the state of Maine was in fact considered in the FEIS. The defendants refer to sections in the FEIS which they contend include consideration of the impact on Maine. *See* FEIS pp. 4–20—4–26. However, the tables to which the defendants refer are primarily forecasts of increases in air and automobile traffic. There is no specific reference to the effect on Maine. The Federal Defendants also refer to the USAF response to comments on the FEIS which request a finding that the project will not exacerbate NAAQS violation in neighboring communities. The USAF response states only that the project will not result in further NAAQS violations and again refers to the transportation tables contained in the FEIS. *See* FEIS Volume II at M–64–65. (USAF Ex. 299). This discussion is inadequate.

In *Appalachian Mountain Club v. Brinegar*, 394 F.Supp. 105, 113 (D.N.H.1975), the court held that an EIS was inadequate because it failed to assess the environmental impact of a highway extension on an area thirteen miles from the proposed highway. The court found that prior objections to the EIS made by the EPA were significant in that they provided prior notice that certain groups believed the project would have an adverse environmental impact on the Franconia Notch area. 394 F.Supp. at 115. Like-

wise in the instant case, CLF raised the need to address air quality concerns relative to Maine in the FEIS as early as July 12, 1990. *See* CLF Letter at 3 (USAF Ex. 182). Therefore, the USAF had prior notice that at least CLF considered the air impact on Maine to be a significant issue.

The CEQ regulations provide some guidance in determining the scope of an EIS. Section 4332(C) provides for the preparation of an EIS for acts "significantly affecting the quality of the human environment." The CEQ regulations provide that acts significantly affecting the environment "be analyzed in several contexts such as society as a whole (human, national), the *affected region,* the affected interests, and the locality." 40 C.F.R. § 1508.27(a) (emphasis added).

The fact that the area affected by the Pease development extends beyond the boundaries of New Hampshire, is not reason to ignore the air quality implications in the FEIS. Both the plain language of the statute and CEQ regulations mandate broader analysis than was contained in the FEIS. Accordingly, the court finds that the FEIS was inadequate for failure to address the air quality impact on Maine.

 CLF next attacks the FEIS on the grounds that it failed to adequately discuss air mitigation measures. While CLF acknowledges that NEPA contains no substantive requirement that mitigation measures be adopted, it does require an extensive examination of mitigation alternatives. CLF argues the USAF failed to satisfy NEPA by merely listing various mitigation measures without a detailed discussion.

The leading NEPA case concerning the discussion of mitigation measures in a FEIS is *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1988). This case involved the application for a special permit to develop and operate a ski facility at Sandy Butte. The development was expected to stimulate extensive commercial and residential growth in a sparsely populated area. In response to the permit application, the Forest Service prepared an EIS to study the environmental impact of the proposed development. The study evaluated five alternative levels of de-

velopment on Sandy Butte including a no-action alternative. The study considered the impact of "water resources, soil, wildlife, air quality, vegetation and visual quality as well as land use and transportation...." 490 U.S. at 339, 109 S.Ct. at 1840.

The EIS concluded that the development itself would not have a measurable impact on air quality however, the resulting off site development would have a significant impact. The additional use of wood burning stoves and increased traffic would cause "significantly diminished air quality...." 490 U.S. at 340, 109 S.Ct. at 1840-41. The EIS discussed mitigation measures that could be taken by the county government and the Forest Service and recommended various monitoring and enforcement measures. The study also discussed various mitigation measures concerning the effect of off site development on the migration of mule deer. The study examined both on site and off site mitigation measures and recommended various alternatives primarily directed at state and local governments. The permit was granted and four organizations subsequently challenged the adequacy of the EIS.

In evaluating the adequacy of the mitigation measures discussed in the EIS, the Supreme Court held that both the plain language of NEPA and the CEQ regulations mandated a detailed discussion of mitigation measures in the EIS. *Id.* at 351, 109 S.Ct. at 1846. However, the Court noted that there was a fundamental distinction between a "requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other." *Id.* at 352, 109 S.Ct. at 1847. The Court found the EIS adequate in the discussion of mitigation measures but emphasized the necessity of a detailed discussion of "steps that can be taken to mitigate adverse environmental consequences." *Id.* at 351, 109 S.Ct. at 1846.

The mitigation measures which the Court found adequate in *Methow Valley* differ substantially to those contained in the Pease FEIS. As stated above, the Methow Valley

EIS contained a detailed discussion of alternative measures designed to mitigate the air quality impact and address the effect of the mule deer migratory patterns. The FEIS in this case falls far short of the mark. Although the USAF had been forewarned that both the EPA and CLF considered air quality to be a concern, the FEIS essentially failed to evaluate any mitigation alternatives. The only mention of mitigation measures in the FEIS is a conclusory statement that a no action alternative would be beneficial to emission reductions. FEIS at 4–119. The USAF relegates any possible mitigation measures to the future owners and their compliance with the New Hampshire SIP.

The Federal Defendants contend that the USAF has satisfied its procedural obligations under NEPA arguing that NEPA does not mandate that the USAF require the PDA to implement specific mitigation measures. The defendants argue that the FEIS is designed to address the environmental impact of the disposal of the Pease base and that the majority of environmental effects will result from its ultimate reuse, not as a result of the transfer. The defendants assert that it is sufficient that the FEIS identify the measures and leave their implementation to future owners. The defendants' argument is flawed for several reasons.

First, CLF acknowledges that NEPA does not require the adoption of mitigation measures. Instead, CLF asserts that NEPA was violated by the failure to adequately examine various mitigation alternatives in the FEIS regardless of whether any specific measure is adopted. The purpose of NEPA is to ensure that all environmental consequences of an agency action is addressed prior to the final decision. Implicit in a discussion of environmental consequences is a discussion of various mitigation alternatives. The statute does not mandate a specific result but does require the careful consideration between the environmental costs and public benefit.

■■■ The defendants are also mistaken in their contention that the role of the USAF as a transferor precludes closer scrutiny of the project after its transfer. Furthermore, the USAF has chosen to retain ownership of a number of parcels choosing to sign a long term lease with the PDA instead of deeding the parcels outright. In *Conservation Law Foundation of N. Eng. v. Gen. Serv. Admin.*, 707 F.2d 626, 633 (1st Cir.1983) the court held that the environmental consequences surrounding the disposal of land by the GSA was a proper subject of an EIS. As such, the EIS was inadequate for failure to address the environmental impact of its probable reuse. The fact that the property was slated for transfer and subsequent redevelopment by a non-federal party did not relieve the transferor of responsibility under NEPA. Likewise, in the instant case, the USAF as transferor is not relieved of its responsibility to properly address the environmental impact of redevelopment. Accordingly, the court holds that the Pease EIS is inadequate for failure to properly analyze the various mitigation measures relative to the development and reuse of the base.

■■■ CLF also claims that the failure of the USAF and the EPA to circulate the MOU constituted a violation of the NEPA public disclosure requirements arguing that the First Circuit requires public disclosure of all documents underlying an EIS decision. *See Commonwealth of Massachusetts v. Watt*, 716 F.2d at 951. However, in the *Watt* case the First Circuit held that documents prepared subsequent to the issuance of the FEIS but not circulated for public review could not act as a Supplemental FEIS. The Federal Defendants do not contend that the MOU acted as Supplemental FEIS in this case. Furthermore, the court has already found that it was not reasonable for the USAF to omit in the FEIS a discussion of mitigation measures and the air quality impact relative to ozone and CO. Accordingly, any Supplemental FEIS would be required to contain a discussion of those issues contained in the MOU.

■■■ CLF contends that the USAF decision not to issue a Supplemental FEIS was unreasonable under the circumstances. CLF specifically challenges the USAF's failure to issue a Supplemental EIS concerning:

> the significant change in circumstances involving continuing federal ownership of the

site and the implications for more aggressive mitigation by the federal owner, the post-FEIS execution of the MOU as mitigation for the project's air quality impacts, and the new air pollution analyses prepared by the State of New Hampshire and relied on by the USAF to support CAA conformity and the transfer of the base. CLF Memo at 61. The Federal Defendants contend that the information received following the FEIS and the decision to include mitigation measures in the MOU and the ROD do not rise to the level which necessitate a Supplemental EIS. They contend that the new information will not have a significant environmental effect on the project and that the conclusions reached in the MOU do not differ substantially from those contained in the FEIS. The Defendants contend that the MOU and the March 1992 Memorandum for the Record merely enabled the USAF to comply with the CAA Conformity Provision without usurping the authority of the PDA in choosing the direction of the redevelopment.

The CEQ regulations provide for supplemental FEIS when: "(i) The agency makes substantial changes in the proposed action that are relevant to the environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9. NEPA itself does not address the preparation of a post decisional Supplemental FEIS however, such a document may be necessary to serve the "action forcing" purpose of the statute. *Marsh v. Oregon Resources Council*, 490 U.S. 360, 371, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377 (1988). NEPA serves the purpose of directing governmental and public attention to all the relevant environmental information prior to an agency decision. The "broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time." *Id.*

The court previously determined that the USAF violated NEPA public disclosure requirements when it failed to include the methods by which the project would conform to the CAA. The court held that it was unreasonable for the USAF to rely on information received subsequent to the preparation of the FEIS in making a conformity determination. The USAF concluded in the FEIS that the project would likely impact the ability of New Hampshire to comply with the 1990 Amendments. However, the USAF later determined in the MOU that the project would in fact conform. The USAF based this determination on the mitigation measures contained in the MOU and the findings of the NHDES. However, neither the MOU nor the findings of the NHDES were subject to public disclosure as required by NEPA.

Further supporting the contention that a Supplemental FEIS is necessary is the EPA's conclusion that the NEPA disclosure requirements were violated by the USAF's failure to include their conformity findings in the FEIS process. FEIS Letter at 5 (USAF Ex. 294). While the court does not find the EPA's opinion controlling, it adds further support to the conclusion that the USAF failed to fulfill the public disclosure requirements. The statutory duty to disclose relevant environmental information is not discretionary on the part of the Air Force. *See Calvert Cliffs'*, 449 F.2d at 1115. Accordingly, the court finds that the USAF failure to include the above information in the FEIS and the failure to issue Supplemental FEIS was not reasonable under the circumstances.

■ The final issue concerning the adequacy of the FEIS was raised by the Town of Newington. Newington asserts that the discussion in the FEIS of the impact of the Pease Development on the surrounding wetlands was inadequate. The USAF contends that the wetlands impact was adequately discussed in the Responses to the DEIS Comments. *See* FEIS Volume II at M–88 (USAF Ex. 299). Again, in evaluating the adequacy of the FEIS the court must use the "rule of reason" standard. However, even in giving the USAF the utmost deference, the response to wetland concerns is woefully inadequate. The USAF simply stated that while it may be possible to complete development without filling any wetlands, the ultimate responsibility lies with the developer.

Executive Order 11,990 imposes additional responsibility concerning wetlands. The Order mandates that each federal agency in the process of disposing of federal land, take action to minimize the destruction or degradation of wetlands. The Order provides that:

Sec. 2. (a) In furtherance of Section 101(b)(3) of the National Environmental Policy Act of 1969 (42 U.S.C. 4331(b)(3)) ... each agency, to the extent permitted by law, shall avoid undertaking or providing assistance for new construction located in wetlands unless the head of the agency finds (1) that there is no practicable alternatives to such construction, and (2) that the proposed action includes all practicable measures to minimize harm to wetlands which may result from such use....

(b) Each agency shall also provide opportunity for early public review of any plans or proposals for new construction in wetlands....

Sec. 4. When Federally-owned wetlands or portions of wetlands are proposed for lease, easement, right-of-way or disposal to non-Federal public or private parties, the Federal agency shall (a) reference in the conveyance those uses that are restricted under identified Federal, State or local wetlands regulations; and (b) attach other appropriate restrictions to the uses of properties by the grantee or purchaser and any successor, except where prohibited by law; or (c) withhold such properties from disposal.

Exec. Order No. 1190, 42 Fed.Reg. 26,961 (1977), *amended by* Exec. Order No. 12,608, 52 Fed.Reg. 54,617 (1987), *reprinted in* 42 U.S.C. § 4321.

The CEQ regulations provide that an EIS include a discussion on the range of alternatives available and how those alternatives meet the purpose of NEPA. 40 C.F.R. § 1502.2. Read together Executive Order 11,990 and the CEQ regulations mandate a thorough examination of the environmental impact of the Pease development of the wetlands and a discussion of the mitigation alternatives. Buttressing this conclusion is the EPA comments on the FEIS. *See* EPA DEIS Letter at 3 (USAF Ex. 212); EPA FEIS Letter at 5–6 (USAF Ex. 294).

In their initial comments on the DEIS, the EPA noted that between 30 and 100 acres of wetlands could be destroyed by various development alternatives requiring an extensive examination of the various alternatives. Furthermore, it was noted that EPA Guidelines presumed that for non-water dependent developments such as Pease, a practical alternative to the filling of wetlands exists. The EPA went on to state that while the DEIS failed to contain an wetland analysis for each development alternative, the DEIS concluded that each alternative would have a significant impact. The EPA recommended further analysis of the wetlands impact. This analysis was not forthcoming.

The USAF's response to EPA's DEIS comments was to completely relegate any wetland analysis to the PDA. In filing their comments on the FEIS, the EPA again addressed the wetlands issue. In their comments, the EPA concluded that the development alternative chosen by the USAF would potentially cause the loss of up to 35 acres of wetlands. The EPA concurred with the conclusions in the FEIS that the impact to any wetlands would be difficult to mitigate however noted the need to at least address the number of acres affected.

The EPA acknowledged the USAF's desire to defer the wetland impact analysis to the developer but noted that such a procedure set a dangerous precedent for future base closings. The court agrees. The lack of wetland analysis and mitigation alternatives flatly contradicts executive Order 1190 as well as the mandate of NEPA. As noted above in the *Methow Valley* case, the Supreme Court observed that a detailed discussion of mitigation measures was an important aspect of the EIS process. *See supra* 285–286. For the foregoing reasons the court finds the USAF exclusion of any meaningful wetlands analysis in the FEIS was not reasonable under the circumstances.

## C. CERCLA Claims

The Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601–57, authorizes the federal government to investigate, contain and re-

move hazardous waste. The purpose of the Act was to provide authority for funding the clean up of hazardous waste sites. *See Ohio v. EPA*, 838 F.2d 1325, 1327 (D.C.Cir.1988). Under CERCLA, the EPA is required to devise a national response plan for hazardous waste cleanup and may then seek reimbursement for the costs from any responsible party. *See* 42 U.S.C. §§ 9604–9607. In the alternative, the EPA may order a responsible party to clean up a site where there is an actual or threatened release of hazardous waste. 42 U.S.C. § 9606(a).

In 1986, Congress enacted the Superfund Amendments and Reauthorization Act ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613, which amended CERCLA in a number of respects. Section 120(h) was added to address the issue of hazardous waste on federally owned sites. 42 U.S.C. § 9620. Section 120(a) provides that federal agencies are subject to the same provisions of CERCLA as private entities. Section (b)–(f) outlined a comprehensive program designed to identify and clean up hazardous waste sites.

Section 120(h) governs the transfer of property owned by the federal government which is known to contain hazardous waste. *See* 42 U.S.C. § 9620(h). Section 120(h)(1) provides that when an agency enters into a "contract for the sale or other transfer" of real property on which hazardous waste was stored for a year or more or known to have been released or disposed of, the contract must contain notice of the location, type and quantity of the waste and notice of the time at which the storage, release or disposal took place. 42 U.S.C. § 9601(h)(1). Section 120(h)(2) dictates the form and manner of the notice while Section 120(h)(3) governs the contents of deeds.

Section (h)(3) provides that each deed entered into for the transfer of contaminated property owned by the United States must contain the information required in the subsection (1) notice requirement. In addition, the deed must contain a covenant warranting:

> (i) all remedial action necessary to protect human health and the environment with respect to any such substance re-

maining on the property has been taken before the date of such transfer, and (ii) any additional remedial action found to be necessary after the date of such transfer shall be conducted by the United States, and

(C) a clause granting the United States access to the property in any case in which remedial action or corrective action is found to be necessary after the date of such transfer....

42 U.S.C. § 9620(h)(3) (1994 Supp.).

In 1992, Congress acknowledged that the closure of certain military installations was causing economic hardship in many areas as result of the loss of jobs associated with the base closures. Pub.L. No. 102–426 § 2, 106 State. 2174. Further, Congress recognized that remediation of hazardous wastes at those sites was causing delay in the property transfer and as a result its further development. In effort to balance the economic and environmental considerations, Congress encouraged remedial action at Federal facilities to be expedited in order to insure environmental safety as well as facilitate a timely transfer of property to mitigate the adverse economic effects on the community. *Id.* To that end, Congress amended Section 120(h)(3) as follows:

> For the purposes of subparagraph (B)(i), all remedial action described in such subparagraph has been taken if the construction and installation of an approved remedial design has been completed, and the remedy has been demonstrated to the Administrator to be operating properly and successfully. The carrying out of long term pumping and treating, or operation and maintenance, after the remedy has been demonstrated to the Administrator to be operating properly and successfully does not preclude the transfer of the property.

42 U.S.C. § 9620(h)(3)(C).

In the FEIS, the USAF addressed the issue of hazardous waste located on the Pease site. *See* FEIS at 3–33—3–59 and 4–67—4–89. The FEIS states that hazardous waste generated at Pease prior to closing has been removed, however waste will continue to be generated. Prior to closing, the Pease

Base an Installation Restoration Program ("IRP") was instigated in order to deal with hazardous waste located on the base. The FEIS elucidates a concise history of the IRP program and its use at Pease. *See* FEIS at 3-35—3-38.

The FEIS states that the IRP was initially developed by the Department of Defense as a mechanism to identify, characterize and dispose of hazardous waste on military installations. When the IRP process was initiated in 1980, it involved four phases. Phase one consisted of problem identification and a search of Superfund records. Phase two was problem confirmation. In Phase three a plan for corrective action was developed and in Phase four it was implemented. With the passage of SARA in 1986, the four phases were condensed into three, consisting of preliminary assessment, remedial investigation and remedial design and action.

The IRP at Pease began prior to SARA. Phase one was completed in 1983 and based on its findings Pease was listed on the National Priorities List for hazardous waste. A phase two/stage one risk assessment had been completed and three IRP site categories established. The stage two, remedial investigation stage began in September 1987. As a result of the stage two efforts, five sites posing threat to human health were revealed. Stage three, remedial design and action, began on those sites in June 1989.

The FEIS stated that the USAF would continue remedial measures at the contaminated sites with each deed of transfer containing assurances that the measures would continue. The FEIS noted that the IRP was an ongoing process and consequently, the FEIS could only provide a "snap shot" of the environmental conditions at that time. Interim remedial measures were established for various sites. Table 4-17 lists fourteen IRP sites and their status as of the date of the FEIS.

The ROD was issued on August 20, 1991, shortly after the issuance of the FEIS in June 1991. The FEIS had stated that all IRP sites would be retained by the USAF and remediated prior to transfer. However, the ROD stated that while the IRP would continue until all sites were remediated, the property would be transferred via long term deed in order to facilitate the redevelopment of the base. *See* ROD at 27.

The Supplemental ROD was issued on April 13, 1992 and finalized the transfer of the remaining parcels. The Supplemental ROD stated that as a result of the location of the contaminated sites, very few parcels would be available for transfer by deed. Instead, the USAF intended to transfer the property by long term leases structured to convey to the lessee the same property rights as those enjoyed by owners. The Supplemental ROD states that the only restrictions on the use of the property placed in the lease, would be those placed in a deed. The leases were structured so as to give PDA the maximum amount of control over the use of the property.

CLF asserts that the transfer of parcels to the PDA via long term lease as opposed to a transfer by deed, violates Section 120(h)(3). CLF contends that while the express language of the Section 120(h)(3) mandates that all deeds transferring contaminated property contain warranties, by implication the provision also applies to transfers via long term lease. CLF contends that the USAF sought to circumvent the requirements of CERCLA by transferring the property by lease as opposed to by deed.

The Federal Defendants respond that the transfers were made by deed for precisely the opposite reason, to conform to the requirements of CERCLA. The defendants assert that the warranty requirements of Section 120(h)(3) do not apply to transfer by lease. Furthermore, the Federal Defendants stress the USAF's intention to continue to remediate the sites until they are ready to be transferred by deed.

The USAF admits that the preferable scenario would have been to transfer all parcels via deed as opposed to long term lease however, the constraints of CERCLA precluded an immediate transfer. In order to quickly facilitate the redevelopment process, the USAF opted to transfer the property by long term lease thereby circumventing the requirements of Section 120(h)(3). While the USAF has stated its commitment in the

FEIS to the continuation of the remediation process, there is no warranty in the leases which assure that an adequate remedial program is in place.

In the ROD, the USAF stated its intention to convert the leases to deed transfers as quickly as the IRP process permits. *See* ROD at 27 (USAF Ex. 453). In describing the IRP, the FEIS states that "[f]or the majority of the IRP sites, the extent of contamination is still being determined. Risk assessments and remedial measures will follow, once sufficient data are gathered." FEIS at 4–67. However, the FEIS does state that until sites are remediated construction will be prohibited and use restricted until no longer a threat to human health. *Id.*

The court does not believe that to allow the transfer by deed of contaminated property without a comprehensive remedial program would serve either the letter or the spirit of CERCLA. This court has held that the remedial intent of CERCLA requires a liberal statutory construction. *See United States v. Mottolo,* 605 F.Supp. 898, 902 (D.N.H.1985). The statute expressly forbids the transfer by deed of contaminated property without remedial measures in place which have proven to be successful. CERCLA does not prohibit the transfer of contaminated property so long as the procedural prerequisites of the statute are first met.

■■■ Accordingly, the court finds that Section 120(h) was violated by the transfer of contaminated parcels via long term lease without an approved remedial design. Furthermore, the court finds that the public disclosure provisions of NEPA were violated for failure to include in the FEIS the decision to transfer parcels via long term lease as opposed to deed. The court declines to void the leases but directs the USAF to prepare a supplemental FEIS within one year of this order. The Supplemental FEIS shall include a discussion of the current IRP status and delineate a remedial design.

### Conclusion

The court is not convinced under the circumstances that the plaintiffs have demonstrated the irreparable harm necessary for granting a preliminary injunction. Accordingly, the court denies plaintiffs' request for an injunction voiding the transfer of property to the PDA.

The court finds that in the USAF violated the public disclosure requirements of NEPA. As such, the USAF is directed to compile a Supplemental FEIS addressing the following. The compliance of the Pease redevelopment with the 1990 CAA amendments, specifically the manner in which the project will comply with the interim emission reduction requirements for ozone precursors; a discussion of the July 30, 1991 CO analysis; the air quality impact on the state of Maine; alternative mitigation measures; an analysis on the impact of the redevelopment on the surrounding wetlands.

The court hereby dismisses the following CAA claims: Count III in the Newington complaint is dismissed and Counts Twelve, Thirteen, Fourteen and Fifteen in the CLF complaint are likewise dismissed.